**In re MAXWELL NEWSPAPERS, INC.**
**d/b/a Daily News, Debtor.**

**Bankruptcy No. 91–15531(TLB).**

United States Bankruptcy Court,
S.D. New York.

Oct. 27, 1992.

See also 981 F.2d 85.

---

922

Jones, Day, Reavis & Pogue by Marc S. Kirschner, Lawrence P. Gottesman, Willis J. Goldsmith, New York City, for debtor.

Vladeck, Waldman, Elias & Engelhard, P.C. by Daniel Engelstein, James Wasserman, and Denny Chin, New York City, for New York Typographical Union No. 6.

Weil, Gotshal & Manges by Harvey R. Miller, Matthew A. Cantor, New York City, for U.S. News and World Report, L.P.

Winston & Strawn by Howard Seife, Margot A. Leffler, New York City, for Official Committee of Unsecured Creditors.

Skadden, Arps, Slate, Meagher & Flom by Michael M. Connery, New York City, for Pressmen & Drivers.

Wiseman, Hoffmann & Walzer by Andrew Sal Hoffmann, Brooklyn, N.Y., for U.S. Mailers Union.

U.S. Trustee's Office by Arthur Gonzalez, New York City.

## DECISION ON DEBTOR'S MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT OF NEW YORK TYPOGRAPHICAL UNION NO. 6

TINA L. BROZMAN, Bankruptcy Judge.

The Daily News is a bleeding dinosaur. What is necessary to save this most venerable institution is its sale to an entity possessing the financial wherewithal and technical expertise to modernize it and allow it to compete in the fierce local newspaper market. Recognizing this, the Debtor's management has moved to reject its collective bargaining agreement (CBA) with Typographical Union No. 6 (Local 6), alone among the Debtor's 12 unions. And why has the Debtor singled Local 6 out for this treatment? Because only the members of that Local have lifetime jobs guarantees which are so expensive that no purchaser could be found who would assume them as written and, despite diligent efforts, no agreement to modify the CBA could be reached with Local 6.

It is with sorrow that I issue this opinion today. The risk that the Daily News will cease publishing shortly if Local 6's contract is not rejected is extremely high. That will cause all 1,850 employees to lose their jobs. On the other hand, if I permit the rejection, there is the threat of a strike or boycott which, if successful, could harm the newspaper. There is also the possibility of a large damage claim which could dilute the return to creditors. I had hoped that the parties could see the wisdom to settling. And I gave them that opportunity twice, once in the middle of the trial and then again at its close when I held off ruling until after the weekend had passed. Unfortunately, they remain at an impasse.

### Background

The other major newspapers which compete with the Debtor for circulation and

advertising dollars are the *New York Times*, *The New York Post* and *Newsday*. Advertising accounts for approximately 54 percent of the Debtor's total revenues; circulation accounts for the remainder.

Over the last decade, the newspaper lost over $100 million. In 1990, during negotiations for successor collective bargaining agreements, the newspaper's then parent corporation, the Tribune Company, sought concessions from the newspaper's unions. In October, 1990, with no new agreements in place, a work stoppage involving ten of the then eleven unions began.

The stoppage lasted for five long months. Circulation plummeted by seventy percent—to 300,000 copies daily. Advertising revenues fell even more, to 11 percent of the prior year's level. The result was that the newspaper lost a staggering $800,000 for each day of the five-month stoppage. In the face of these losses, in January, 1991, the Tribune Company announced that it would shut down the Daily News in sixty days unless a purchaser could be found.

What seemed to be salvation appeared in the form of Robert Maxwell, who, through this debtor, Maxwell Newspapers, Inc., acquired the Daily News, ending the work stoppage. The Tribune Company paid Maxwell some $60,000,000 to take the newspaper off its hands. This money was intended to be used for incentives to induce employees to leave. Based on concessions obtained from the newspaper's unions, Maxwell eliminated nearly 30 percent of the Debtor's union-represented work force. He made even greater reductions, in the neighborhood of 50 percent, in the newspaper's salaried, non-union employees. After acquiring the paper, Maxwell made still further reductions.

Despite payroll savings and steady recovery of its circulation and advertising, in the second and third quarters of 1991 the Debtor lost $31 million. Although the Debtor had achieved a near break-even level of operations in the fourth quarter of 1991, the London-based Maxwell empire collapsed into bankruptcy in December, leaving the Debtor with no financial backing and precipitating this chapter 11 case.

On December 5, 1991, shortly after Maxwell's death, the Debtor filed for Chapter 11 relief. At the time the petition was filed, it had a cash balance of $8 million.

The Debtor's continued net losses have steadily eroded this $8 million balance. In the first 9 months of 1992, the Debtor lost approximately $8,900,000. The Debtor projects that because of traditional year-end increases in advertising, its net losses for the year will be approximately $7.2 million. No matter how gauged, the Debtor's financial condition is extremely weak. Absent a sale with a substantial cash infusion, the expiration of the Debtor's post-petition financing arrangement with Sterling National Bank & Trust Company in mid-February 1993 will force the Debtor to close shop. The post-petition lender has not expressed any willingness to lend more money to the Debtor or to remain in place beyond February.

In an unprecedented move for a chapter 11 case, the News formed a Working Group, which included, among others, representatives of various unions, trade creditors, Salomon Brothers and accountants all of whom were looking toward reorganization. The Working Group set out to find prospective buyers for the paper. After an exhaustive search, the choice was narrowed to two bidders, and ultimately, one of those bidders, Hollinger, Inc. ("Hollinger"), acting in conjunction with its subsidiary American Publishing Company, was granted the first right to conduct negotiations with the Debtors' unions and with the Creditors' Committee. Hollinger, aided by the Debtor, thereafter commenced intensive negotiations in an effort to win the union support needed for its bid to be a successful one. A sticking point in the negotiations, however, proved to be the clause, applicable to successors and assigns, which gives lifetime job guarantees to the remaining 167 typographers who are members of Local 6. No one disputes that many of the typographers are unneeded to man the composing room in which they work. Technological advances have ren-

dered them superfluous. Even the union admits that the work could be performed by only 108 people. Zolfo, Cooper & Co., consultants to the Debtor retained at the behest of the Creditors' Committee, reported that the composing room and technical functions could be performed with just 67 people if some of the functions of the composing room staff were transferred to other departments. The Debtor itself estimates that as it currently operates, it needs only 95 of the Local 6 personnel to perform the 167 jobs. With modest capital improvements the Debtor estimates it should need only 40 people.

The cost to the Debtor of retaining the 167 members of Local 6 on its payroll is approximately $9.3 million per year, or more than $2 million in excess of the Debtor's projected 1992 losses. Because the average age of the Local 6 members is 58½, these obligations could continue through the year 2012.

The wage and benefit rates for Local 6 members are higher than for any other craft employees, exceeding by at least 10% the closest craft and by 20% most other crafts. Local 6's hourly wage rate is the highest of any hourly employee's at the Daily News. An accountant engaged by Local 6 testified that every excess member of Local 6 who the Debtor employs costs it $61,725. In short, the lifetime job guarantees are a crippling financial burden on the Debtor.

Hoping, nevertheless, to be able to fulfill the expectations of Local 6, the Debtor implored Hollinger to assume the lifetime guarantees, but Hollinger refused. The Debtor also suggested changes which might be acceptable to Local 6, including work sharing, buyouts and an early retirement plan. Ultimately unable to win sufficient union support, Hollinger withdrew from the bidding process. The Debtor negotiated as well with a group known as Silver Screen, which was later replaced by Whitman Heffernan Rhein. This group, too, was unwilling to assume the lifetime job guarantees.

The Debtor's financial condition steadily worsened during the period in which the Debtor was negotiating with Hollinger. Faced with projections indicating that it would exhaust its cash and available credit within a few months, on September 1, 1992, the Debtor filed a motion for an order authorizing interim changes to all its collective bargaining agreements pursuant to section 1113(e) of the Bankruptcy Code. That motion sought authorization to impose an across the board, temporary 10% wage and benefit cut which the Debtor would match with an equal cut for nonunion employees. Shortly before the return date of the motion, the Debtor prepared new financials which showed that, although it was still operating at a very substantial loss, it had approximately $400,000 more in cash than it had anticipated it would have. Thus, to try to come up with less draconian alternatives, since it had a few weeks' breathing room, it adjourned the motion.

Immediately after the withdrawal of the Hollinger offer, the Debtor pursued its other options. Finding an alternative expeditiously was critical for reasons including the loss of $3 million of interim debtor in possession financing that Hollinger was to make available to the Debtor to operate despite continued losses and to cover the additional, ongoing administrative costs of the chapter 11 case. The Debtor therefore pursued a potential asset sale to Mortimer Zuckerman as well as a so-called standalone plan of reorganization which would have involved an equity contribution by Silver Screen. This plan, like Hollinger's, was conditioned on union support.

Zuckerman bargained intensely with the unions in an effort to win their support for his proposed purchase of the newspaper. But he similarly turned a deaf ear on the Debtor's request that he assume the lifetime jobs guarantees because he did not need all 167 employees in the much more technically advanced operations which he planned. Somewhere as early as the end of June, Zuckerman's representative had told Local 6 that he was willing to replace lifetime guarantees with a proposed number of jobs or a shift equivalent. The discussion broke down at this suggestion, since he was led to understand that the

lifetime jobs guarantees were inviolate, or at least that involuntary layoffs were out of the question.

Notwithstanding this immediate lack of success with Local 6, Zuckerman has been able to reach agreement with 8 of the 9 unions which are members of the Allied Printing Trades Council (the Allied Unions). Accordingly, on September 23, 1992, the Debtor, New DN Company, a Zuckerman affiliate, and Zuckerman presented me with an asset purchase agreement contingent on his reaching agreement with all 9 of the Allied Unions. It is particularly significant that New DN Company has agreed to construct the new color printing plant which the Working Group believes is critical to the future viability of the newspaper. The Asset Purchase Agreement does not obligate New DN Company to assume the lifetime job guarantees. However, it does provide that New DN Company will attempt to reach agreement with Local 6 and will add $1 million to the purchase price of the Debtor's assets should it fail to reach agreement with Local 6 and should the Debtor reject the CBA.

Contemporaneously with the negotiation of the Asset Purchase Agreement, the Debtor and U.S. News & World Report (a Zuckerman affiliate) negotiated the terms of a $3 million debtor in possession financing facility, $1 million of which would become available upon my approval of the facility. I approved the loan on September 25 and scheduled a hearing to consider approval of the Asset Purchase Agreement for October 22. In light of the developments with Zuckerman, the Debtor agreed to further adjourn until October 22 the section 1113(e) motion.

On October 1, 1992, the Debtor met with Local 6 and proposed an initial modification to Local 6's CBA which would:

(1) Eliminate any possible obligation of the Debtor to require the purchaser of any assets or stock of Debtor during a proceeding, or pursuant to a plan under the Bankruptcy Code, to employ employees represented by Local 6.

(2) Eliminate, effective at the time Debtor ceases publication, any possible obligation of Debtor to employ any employee represented by Local 6 if the Debtor sells substantially all its assets or stock during a proceeding, or pursuant to a plan, under the Bankruptcy Code and permanently ceases publication of a newspaper.

(3) Eliminate any possible obligation to resolve by arbitration any controversy regarding any of the foregoing matters.

The Debtor provided Local 6 with a wealth of information, describing in detail the impact of Local 6's CBA on the Debtor's financial stability, delivering charts comparing previous reductions suffered by Local 6 with reductions suffered by the other union and nonunion employees, and informing Local 6 how each prospective purchaser felt about the lifetime job guarantees. The Debtor reported that it had vainly sought to convince the prospective purchasers to honor Local 6's CBA. Finally, the Debtor announced that it would make itself available to the Local 6's representatives each day for the following week in the hope that the Debtor and Local 6 could reach agreement on modifications to Local 6's CBA. The Local 6 responded that it would consider the Debtor's proposal and provide a counter-proposal. It also indicated its agreement to meet again on October 14 but cautioned the Debtor that the Local's lawyers believed section 1113 was unavailable to the Debtor.

While this was going on, Local 6 brought by order to show cause a motion seeking to compel the Debtor to arbitrate its dispute prior to the hearing on the proposed sale. Local 6 contended that the Debtor had breached the CBA by agreeing to a sale with Zuckerman which did not include assumption of the lifetime job guarantees. I denied that motion on October 8 and instructed the parties that the time for hard bargaining was at hand.

As all parties understood, the key to these negotiations was the prospective purchaser since Maxwell Newspapers, Inc. would cease to own the business of the Daily News once a sale were to close. Local 6 had once before in a bankruptcy case suffered a rejection of its collective bargaining agreement because it had refused

to negotiate in good faith with the debtor. *See In re Royal Composing Room, Inc.,* 62 B.R. 403 (Bankr.S.D.N.Y.1986), *aff'd,* 848 F.2d 345 (2d Cir.1988). It obviously wanted to avoid a repeat performance.

On October 14, 1992, Local 6 made a proposal to the Debtor which, although the Debtor deemed it unacceptable, the Debtor admitted was a constructive approach. There were several key elements to this proposal, the first of which was a retreat from lifetime job guarantees. The union proposed to view work in terms of shifts, rather than people. Since there are 167 employees with lifetime job guarantees entitling them each to work 5 days a week, the maximum number of shifts the News is obligated to provide is 835. (The actual number of shifts provided is closer to 770.) The union proposed to reduce this to 540 shifts (or 108 full-time jobs) conditioned on the Daily News offering to every bargaining unit member a buyout of cash and three years' contribution to the pension and welfare funds as well as an early retirement enhancement. The 540 shifts was calculated with reference to the age of the employees. In other words, the union hoped to induce those of age 62 to leave. To the extent that insufficient people retired, the remaining workers would still share the 540 shifts, with the result that they might not work a full week. Three years later, in 1996, the guaranteed shifts would be reduced to 425, in 1999 be further reduced to 300 and in 2002 to 200 so long as at each date the employees were offered the buyout and early retirement incentives. The next key element was that the union would negotiate with the purchaser over the sharing of work assignments. New employees could be hired at whatever wages they agreed to work. The wage increase formula would mirror that offered to the other unions.

The Debtor responded the following day, October 15, with a proposal structured along the lines of that drafted by the union but which, among other things, hastened the reduction in shifts to an immediate cut to 400, and then once the color printing plant were operational, to 300, and then one year thereafter to 250, the following year to 200, and finally, to 150. The Debtor/Zuckerman team declined to provide any buyout or payment to the pension and welfare funds but proposed to give an early retirement subsidy payment which would take the form of adding 5 years to the age at retirement and 5 years to the working time at the Daily News. In addition, the publisher's jurisdiction with respect to work assignments was broadened and the contract, which would subsist for 13 years, was in fairly small measure updated. Further, there was proposed a no-strike/no lock-out clause.

On October 19, Local 6 responded. It stood firm on the first shift reduction being to 540 but accelerated the dates and times of all later reductions down to 200 shifts. It also tentatively agreed to the early retirement program proposed by the Debtor and Zuckerman. It declined to address the other changes to the agreement until it appeared that the gaps were closing on guaranteed shifts, buyouts and jurisdiction. Although the Debtor and Zuckerman did not proffer any written counterproposal, discussion continued.

On October 21 the union revised its own proposal to drop the buyout, to increase to six years from five the early retirement enhancements, to include a $10,000 payment to retiring employees, and to lower the first shift reduction to 500 and the second to 350, with the balance to remain as per its previous proposal. The union added however a provision that in no case would the remaining employees work less than four shifts per week. When met with Zuckerman's steadfast opposition to the guarantee of four shifts per week, the union dropped that demand.

During these later negotiations, both sides expressed frustration with their inability to figure out with the information available to them what the early retirement 5 + 5 program would actually cost. Zuckerman tried to quantify for the union what the impact would be on somebody retiring under that proposal. But it became apparent that those numbers were extremely difficult to develop. Zuckerman believed the union's last proposal was actually more

expensive than its prior one due to the substantial increase in the early retirement enhancement.

Because he estimated that the early retirement program could cost anywhere from maybe $3 million to $10 million, Zuckerman decided that he would not offer it. Instead, late in the evening on October 21, he delivered a final proposal. Whereas the union had approached its negotiations from the perspective of achieving reductions through inducing employees to retire, Zuckerman had approached the negotiations from the perspective of how much work there was to be done. The final proposal was for 400 shifts per week, that is, 80 jobs, until the new plant opened, at which time the shifts would be reduced to 300 (or 60 jobs) then reduced a year later to 150 (or 30 jobs) and one year thereafter to 75 (or 15 jobs), which would be guaranteed for the 13 year life of the contract. Although Zuckerman did not agree to fund any length of continued payments to the Pension & Welfare Fund for retiring employees, he did agree to give the Fund an immediate $1,000,000. At the current very comprehensive level of coverage, that sum, according to the union's president, would have been adequate to fund continuing coverage for up to a year and a half. With changes in coverage, of course, the sum would go farther. Zuckerman's chief negotiator, Fred Drasner, who is president and CEO of U.S. News & World Report, chairman and CEO of Applied Graphics Technology and Vice President and CEO of Atlantic Monthly testified that with a capital outlay of about $1.5 million, Zuckerman could eliminate the need for all of the typographers at the Daily News. Notwithstanding, Zuckerman agreed in his final proposal to provide employment for 80 typographers, to ease the transition to the new technology over what would probably be four years and to continue to employ for 13 years 15 typographers. The cost of this proposal to him is $30,000,000. Perceiving that this final proposal was less rich than the previous one which the Debtor drafted and Zuckerman adopted, Local 6 turned it down.

Having failed to reach agreement, the Debtor now seeks to proceed with the rejection which it requested in its motion of October 9. As the Debtor's senior vice president and general counsel, Jay Swardenski, testified, Mr. Drasner plainly informed him that he will not accept the lifetime job guarantees; now that the parties have proved unable to come to an accord, Drasner says that he and Zuckerman will walk away from the transaction if Local 6's CBA is not rejected. The Debtor fears that if the contract is not rejected, there is little likelihood that any purchaser would agree to assume it since it guarantees approximately $9.3 million a year in salaries to employees many or all of whose functions have become obsolete. The short-term financial projections illustrate that the Debtor cannot sustain its losses; by February, it will have to cease operations. In that event, the approximately 13 to 18% distribution to creditors which the Debtor estimates will be available from the sale to Zuckerman will evaporate, the Local 6 members will lose their jobs and the Daily News' 1700 other unionized employees will face the same fate.

Local 6 objects to the Debtor's motion on a number of fronts: (1) that § 1113 of the Code does not permit "retroactive rejection;" (2) that a proposal can only consist of modifications and not termination; (3) that § 1113 does not apply within the sale context so that I cannot consider Zuckerman as a Debtor surrogate; (4) that the correct benchmark for viewing the § 1113 motion is the purchaser, and not the Debtor; (5) that the Debtor has not treated Local 6 fairly and equitably; (6) that the Debtor did not negotiate in good faith; (7) that the Debtor cannot demonstrate that Local 6 did not reject the Debtor's proposals with good cause; (8) that the Debtor has filed to supply it with the necessary information to evaluate the proposals; and (9) that the balance of equities tips in favor of denying the Debtor's motion.

## DISCUSSION

Congress enacted § 1113 of the Bankruptcy Code in response to *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188,

79 L.Ed.2d 482 (1984), where the Supreme Court concluded that a debtor in possession could reject a collective bargaining agreement, subject to certain constraints. *Truck Drivers Local 807 v. Carey Trans., Inc.,* 816 F.2d 82, 87 (2d Cir.1987). Congressional response to *Bildisco* was swift, culminating within a few short months in · the passage of section 1113. *In re Century Brass Products, Inc.,* 795 F.2d 265, 266–67 (2d Cir.1986).

■ Section 1113 imposes on the debtor in possession prior to filing a motion to reject the obligation to make a proposal to the union based on the best available current information which provides for the necessary modification in benefits and protections to permit the debtor's reorganization and assure that all creditors, the debtor, and all affected parties are treated fairly and equitably. Between the making of the proposal and the hearing to reject, the debtor in possession must meet with the union to confer in good faith in an attempt to reach mutually satisfactory modifications of the collective bargaining agreement. The court may approve rejection of the collective bargaining agreement only if it finds that the debtor has made a proposal as described in the statute, the union has refused to accept the proposal without cause and the balance of equities clearly favors rejection of the agreement. 11 U.S.C. § 1113; *Truck Drivers Local 807 v. Carey,* 816 F.2d at 88; *Century Brass Products, Inc.,* 795 F.2d at 273.

■ Before looking at whether the Debtor has made the three showings necessary to support rejection I will address the union's threshold objections. The first is that the motion seeks a "retroactive modification" of the Debtor's alleged breach in agreeing to a sale without honoring the lifetime job guarantees. The motion does not seeks a retroactive modification but rather an immediate rejection of Local 6's CBA. There is no breach for there is not yet a binding sale agreement which will ensure that Local 6's lifetime job guarantee clause will not be honored. The Debtor cannot effect a sale of its assets out of the ordinary course of business pursuant to section 363 of the Code nor can it assume and assign an executory contract pursuant to section 365 of the Code without the imprimatur of this court. Until such time as I approve the sale contract, it does not bind the Debtor's estate. No Local 6 employees have been terminated and they are all still receiving their wages and benefits as they have since the case began. Moreover, even if there had been a breach, nothing in the language of section 1113 suggests that a debtor cannot reject a collective bargaining agreement if it has breached that agreement so long as the debtor has negotiated in good faith. *See In re GCI, Inc.,* 131 B.R. 685, 694–97 (Bankr.N.D.Ind.1991). This is not a case like *Shugrue v. Air Line Pilots Ass'n (In re Ionosphere Clubs, Inc.),* 922 F.2d 984 (2d Cir.1990), *cert. denied* —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991), which involved the use of the automatic stay of section 362 to alter the arbitration provision in the collective bargaining agreement. Instead, this case involves a supposed breach of a CBA by an employer which has in no way effected a permanent, unilateral termination or modification of any contract provision. All that has occurred is that the Debtor has sought approval of a contract of sale which contemplates that the Debtor will seek to reject a CBA in the absence of agreement among the parties. Indeed the Tenth Circuit in *Sheet Metal Workers' International Association v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.),* 899 F.2d 887 (10th Cir.1990) held that a proposal containing modifications which, if implemented, would violate labor law does not *per se* fail to satisfy subpart (b)(1)(A) of section 1113 and does not relieve the union of its duty to bargain in good faith. If a debtor may propose to violate federal labor law and still be permitted to reject, then surely a debtor may seek court authority to breach a collective bargaining agreement through an intended sale and still be permitted to reject.

■ Local 6's second objection, that the Debtor failed to comply with the pre-application requirement of proposing modifications to the CBA, is facially more appealing

but ultimately unpersuasive. The Debtor's October 1 proposal was a troubling one for the union, in that it proposed to simply eliminate the lifetime job guarantees. The union argues that this was worse than a rejection, because the union would have had no damage claim. But it is also the case that the Debtor did not say that it or the purchaser would immediately terminate all employees. And the Debtor proposed to maintain all the other terms of the contract in effect for employees remaining on the job. I thus construe the proposal, not as a termination of the collective bargaining agreement, but as a modification of the term, albeit an important one to the union, which was in the Debtor's view essential to its ability to reorganize. Moreover, when this was presented, Mr. Swardenski informed the union's representatives that he was ready to meet to negotiate this proposed modification.

Even if I am too generous in my construction, however, section 1113(c) says that I may approve rejection only if I find that the debtor has "prior to the hearing" made a proposal that fulfills the requirements of subsection (b)(1). Thus, even if the pre-application proposal is not a paradigmatic proposal in the section 1113 context, I may look to the subsequent prehearing proposals. *Royal Composing*, 62 B.R. at 407; *In re Allied Delivery System Co.*, 49 B.R. 700, 703 (Bankr.N.D.Ohio 1985) ("Section 1113(c) refers merely to a proposal made 'prior to hearing . . .', which, in this case, is the debtor's counter-proposal, presented after the union made its own proposal.") Plainly the subsequent proposals with their retained job shifts and gradual reductions in shifts coupled with retention of most of the balance of the CBA reflected modification and not termination.

■ The third objection is that I cannot consider Zuckerman's proposals as a surrogate for the Debtor's because section 1113 refers to the trustee or the debtor. I have previously ruled adversely to Local 6 on its argument that section 1113 does not apply when the Debtor seeks to sell its business as a going concern. This new argument simply puts a subtle spin on what I've

already decided. It is certainly undeniable that section 1113 makes no reference to a sale and, as a result, does not fit neatly into the sale context. But since maintenance of a business as a going concern is what chapter 11 is all about, it makes little sense to me to hold that once the debtor has identified a potential purchaser it forfeits the right to do what is necessary to cause a sale to occur. What Local 6 argues, in effect, is that a debtor can only reject a collective bargaining agreement consistent with the debtor's own needs while it is in control of the business and cannot consider the needs of the purchaser. Where relatively minor modifications to the CBA are needed, such as hourly wage reductions or a change in working rules, modification by a debtor which anticipates that it may need to sell the business might not cause any great harm. But where the term and offending clauses of the collective bargaining agreement cause dire financial consequences to the business, requiring the debtor to negotiate modifications to the agreement as a prelude to a possible rejection could have the perverse effect of disabling the debtor from ever selling the business if the modifications which it negotiates are not sufficient from the perspective of a purchaser. Where, as here, a debtor is losing money consistently and does not have the ability to infuse more capital into the business, its best chance for preserving jobs and realizing a return for its creditors is to sell the business. But unless it can escape those collective bargaining agreements which straitjacket it, it may never be able to accomplish a sale. Local 6 says that this is what section 1113 must mean; the debtor cannot use the section to achieve the needs of the ongoing business, as envisioned by the purchaser, so that the business can be sold and thrive. I do not agree. A holdout union should not be able to frustrate reorganization simply because the business will change hands.

■ This brings me to the next, related argument, that one should judge whether modifications to the CBA are necessary not from the perspective of the requirements of the debtor's business but from the perspective of how wealthy the purchaser is.

This is senseless. The relevant determination is whether the debtor's business requires the relief sought in order to be maintained as a going concern. That there are wealthy suitors for an ailing debtor's business matters little if those suitors will not marry the debtor because of the economic handcuffs which the debtor wears. In other words, it is the viability of the business as a going concern which ought be the reference point. If the relief is not necessary to the economic health of the enterprise, it ought be denied. If it is necessary, and the other requirements of section 1113 have been fulfilled, it ought be granted. *See In re Evans Products Co.*, 55 B.R. 231 (Bankr.S.D.Fla.1985) (where sale of business was foreseeable, court did not hesitate to grant § 1113 relief to debtor based on its own financial condition).

The remainder of Local 6's objections distill to three, each of which goes to the heart of the three substantive showings required under *Carey*.

■ The first substantive showing the Debtor must make is that its post-petition, pre-rejection proposal for modifications satisfies section 1113(b)(1), which in turn limits the debtor to proposing only those necessary modifications in benefits and protections that are necessary to permit the reorganization of the debtor, and obliges the debtor to assure the court that "all creditors, the debtor and all affected parties are treated fairly and equitably." *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 88. As the Second Circuit noted in *Century Brass*, this provision emphasizes the requirement of the debtor's good faith in seeking to modify its existing labor contract. *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 88, *citing In re Century Brass Products, Inc.*, 795 F.2d at 273. The debtor must show that its pre-rejection proposal was made in good faith and contains necessary, *but not absolutely minimal*, changes that will enable the debtor to complete the reorganization process successfully. *In re Royal Composing Room, Inc.*, 848 F.2d at 348.

■ The purpose of this substantive requirement is to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree, through fair and equitable treatment. *In re Century Brass Products, Inc.*, 795 F.2d at 273. Equitable, however, does not mean equal. The debtor need not show that all involved employees are having their salaries and benefits cut in the same percentage. *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 90–91. Rather, the court may look to pre-petition concessions that were made by certain employee groups as well as parity in determining whether every constituency has sacrificed. *Id.*

■ We begin with good faith. I have already determined that the October 1 proposal was not a proposed termination but, rather, a modification. In any event, subsequent proposals sought much less severe modifications of the CBA. The parties have met almost continuously since October 14 to come to an accord. Local 6 questions whether it was good faith to supply it with a final proposal giving less than had previously been offered. Of course, Drasner believes that Local 6 did precisely the same thing when its last proposal increased the early retirement enhancement which both sides had complained was so difficult to quantify. Even the union's accountant testified that he could not quantify the cost of the early retirement enhancement. Whereas Zuckerman's final proposal may not have been the most fruitful method of ensuring Local 6's agreement, I cannot conclude that it was not made in good faith. Drasner was certain that a capital infusion of $1.5 or 2 million could have eliminated the need for all 167 employees, nonetheless he proposed to retain 80 of them at their existing wage and benefit levels until the color printing plan opened, reduce that number down to 15 over the course of two more years and retain the 15 for the balance of the 13 year contract. In addition, he proposed to give the Pension and Welfare Fund $1,000,000. The rationale for this proposal was twofold: the early retirement enhancement was too difficult to quantify and the further reductions in work shifts were tied

directly to what Zuckerman believed the needs of the operation would be both before and after the new plant were opened. Undeniably opinions differed on needed staffing levels, but the union itself acknowledged that only 108 people rather than 167 were needed. The eighty people to whom the purchaser was guaranteeing jobs was a subjective but reasonable assessment in light of other assessments, some a little higher and one a little lower, which had been made.

■ I find little merit in Local 6's contention that the Debtor did not negotiate in good faith because (a) it failed to turn over the relevant information Local 6 needed to evaluate its position and negotiate, or (b) did so but too late. Section 1113 requires that the best available information be furnished. It does not require that actuaries be hired in the middle of negotiations to attempt to quantify the changing proposals which the parties are negotiating. The Debtor was not required to turn over to Local 6 the contracts which Zuckerman had negotiated with the other unions and which the Debtor did not have. Indeed, Zuckerman negotiated separately with each union and did not furnish the other unions with copies of one another's proposed contracts. Local 6 was treated no differently in this regard. Local 6 was given a great deal of information including a chart computing prepetition manning reductions affecting Local 6 with those affecting other union and exempt employees; details regarding the Debtor's labor costs; and photocopies of provisions common to all the collective bargaining agreements which Zuckerman had negotiated. In addition, Zuckerman's representatives gave Local 6 the information which they had developed concerning the potential cost of the early retirement enhancement. No other information was necessary or available with respect to the proposed modifications to the CBA. Accordingly, the Debtor has satisfied its burden of demonstrating that it has bargained in good faith.

Equally, I find that the Debtor has sustained its burden of demonstrating that its pre-rejection proposals contain necessary even if not absolutely minimal, changes which will permit the Debtor to complete the reorganization process successfully. *In re Royal Composing Room, Inc.,* 848 F.2d at 348. No one disputes that the newspaper is in serious financial straits; without an infusion of capital in the near future, the newspaper would cease operations as early as the first quarter of 1993. Absent this infusion of funds brought about by a sale to a sound enterprise, the newspaper is doomed. However, no prospective buyer will purchase the newspaper so long as it must contend with Local 6's lifetime job guarantees to 167 largely unneeded employees potentially until the year 2012. Clearly, modifying the CBA to remove this lifetime guarantee clause is necessary to permit a purchaser to buy the newspaper and to allow the Daily News to operate viably in the future.

■ Finally, insofar as the Debtor's burden is concerned, I conclude that the Debtor's proposal is fair and equitable to all creditors, the Debtor and all affected parties. Local 6 suggests that only it, and no other union, will suffer extinction as a result of the Debtor's proposal. That is incorrect. The most recent proposal contemplated a reduction rather than elimination of Local 6's workforce. A review of the prepetition manning reductions borne by the other unions in comparison to Local 6 underscores that these cuts are indeed equitable, as well as warranted by changing technology.

The Debtor regularly measures the size of its workforce in terms of the number of "full time equivalents" ("FTEs") on the payroll. The number of FTEs is calculated by dividing the Debtor's payroll and payroll-related expenditures, i.e., pay for hours worked, overtime, vacation pay, sick pay, etc., by five, the number of days per week regularly worked by a full-time employee. During the period from September 1990 to August 1992, FTEs for exempt employees (i.e., managers and supervisors) declined 58 percent. During the same period, FTEs for employees represented by the Guild fell by 34 percent; the Drivers, by 46 percent; the Pressman, by 47 percent; the Mailers,

by 45 percent; the Paperhandlers, by 54 percent; Machinists and Electricians, by 21 percent; and Engravers and Stereotypers, by 27 percent. In stark contrast, the typographers represented by Local 6 came through this period virtually unscathed, having dropped in FTEs by a mere 13%. And the typographers are by a wide margin the highest paid hourly employees and admittedly overstaffed. The unsecured creditors will not fare well. Their estimated return is only 13 to 18 cents on the dollar. To my mind, the last proposal to Local 6 did no more than seek to have Local 6 assume its portion of the "shared sacrifice" required if the newspaper is to be purchased and survive into the next century. Accordingly, I find that the Debtor has satisfied the first substantive showing required under *Carey*.

I turn now to the second *Carey* showing, whether the union rejected the Debtor's proposals without good cause. 816 F.2d at 88. Although the debtor retains the burden of persuading the court that the union lacked good faith for refusing proposed modifications, the union must nonetheless come forward with evidence of its reason for declining to accept the debtor's proposal in whole or in part. *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 92.

Local 6 first contended that Debtor's original proposal, which Local 6 rejected, was not made in good faith and therefore Local 6 had good cause to reject it. However, this argument is beside the point, ignoring, as it does, the later proposals.

Local 6 states that it would be better off rejecting the modifications and taking its chances with a court-ordered rejection in that it would receive a substantial claim for damages. This type of "scorched earth" approach is not good cause for rejecting a proposal. *See In re Indiana Grocery Co.*, 138 B.R. 40, 50 (Bankr.S.D.Ind.1990) (union had not rejected proposal with good cause where union had rejected proposal because it concluded that Debtor could not survive even with proposed cuts and its members would be better off retaining their administrative claims after rejection. Court con-

cluded that this purely selfish concern cannot be good cause for refusing to cooperate with the debtor's good faith efforts to reorganize.)

Just exactly what constitutes good cause to reject the debtor's proposal is not defined in the statute and has been difficult for the courts to pin down. Although some courts have suggested that good cause to reject the proposal cannot exist if the debtor shows that it bargained in good faith, that the proposed modifications are necessary, and that they are fair and equitable, the Second Circuit has rejected that standard except where the union has neither participated meaningfully in post-petition negotiations nor offered any reason for rejecting the proposal other than its view that the proposed modifications were excessive. *Carey*, 816 F.2d at 92. Manifestly, Local 6 bargained hard here. It would seem that a union may safely refuse the debtor's proposal if its members are being unfairly burdened relative to the other parties or the proposal is not necessary for the debtor's reorganization, but, otherwise, the union cannot safely turn down the proposal if it has not proffered an alternative which accomplishes the same economic end and fulfills the needs of the reorganization.

Here, it bears repeating that no other workers for the Daily News have a lifetime guarantee and no other union has suffered nearly as small a cut, by FTE standards, as has Local 6 in the period from September 1990 through August 1992. Without question, the union was caught off guard by the final proposal. But that proposal was grounded in the anticipated needs of the ongoing business and the union offered no more palatable alternative which would accomplish the same economic result. Zuckerman was promising to maintain jobs for some 80 employees initially, to give a wage structure to those employees commensurate with that of the other unions, to give the Pension and Welfare Fund $1,000,000 to aid in the expressed union desire to maintain health insurance for terminated employees and to reduce the remaining guaranteed jobs over a period of two years which would not begin until the anticipated

new color plant were operational, at which time most all of the typographers' functions probably would become obsolete. Notwithstanding this obsolescence Zuckerman still agreed to phase out the remaining shifts gradually until there were only 75, which translates to 15 guaranteed, full-time jobs left. Whereas the union may not have liked this proposal because it would eliminate jobs for people prior to age 62, and because it contained no inducement for the employees to retire, Local 6's president admitted that no such inducement is required. The union wanted it because voluntary buyouts had been offered to its members prepetition. And the union wanted these same incentives to be offered to the remaining employees. The union refused to focus on the needs of reorganization for a business which is losing a great deal of money. Instead, Local 6 clung steadfastly to its position that the excess employees had to be given a sweetener to induce them to leave. The Debtor did not have the ability to fund this, and Zuckerman, who put a good faith proposal on the table, declined to do so, as was his prerogative. Local 6 believes that it was therefore justified in declining the final proposal, as a result of which, it says, I may not permit rejection. The construction which Local 6 gives to the statute would allow a union to frustrate rejection any time that it could articulate a reason why the debtor's proposal is distasteful even though rational, made in good faith, fair and equitable, and consistent with the needs of reorganization. That amounts to a veto power and cannot be the proper statutory reading. I conclude that Local 6 has rejected the final proposal without good cause.

■ I now turn to the third and final substantive showing required under the *Carey* test. This prong is nothing more than a codification of the *Bildisco* standard, *In re Century Brass Products, Inc.*, 795 F.2d at 273, and requires that the balance of equities clearly favors rejection of the collective bargaining agreement. Although the test is a broad and flexible one, its limits are not boundless. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equi-

ty, but rather only how the equities relate to the ultimate goal of Chapter 11; that is, the prospects for a successful reorganization. *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 92–93, *citing NLRB v. Bildisco & Bildisco*, 465 U.S. at 527, 104 S.Ct. at 1196.

■ There is little doubt that the Debtor's chances of successfully and expeditiously finding a purchaser for the newspaper are virtually nil if such a purchaser must assume the lifetime job guarantees. The history in this case is ample illustration. Although Local 6 has submitted an affidavit of a principal in the firm that represented Hollinger in support of the notion that successful reorganization does not require abrogation of the lifetime job guarantees, the affidavit is carefully crafted. It says that Hollinger could have allowed the guarantees if it had firm indications that it could reach desired manning levels, possibly through buyouts. The bottom line is that Hollinger, a disappointed bidder, was unwilling to preserve lifetime jobs guarantees unless, like Zuckerman, it knew that it could achieve substantial manning reductions consistent with its needs. But when the Debtor asked Hollinger to assume the lifetime job guarantees outright, Hollinger refused. Whereas buyouts would have made Zuckerman's proposal more to the liking of Local 6, Zuckerman is not offering buyouts to any employee and has no obligation to do so.

This Debtor is desperately in need of a substantial cash infusion if it is to remain in business. As things stand now, time is its worst enemy. The continuation of the lifetime job guarantees as contained in the CBA virtually ensures that that cash infusion will be unavailable with consequent devastating effect to the creditors and other employees, union and non-union.

I have considered whether a strike would result if the agreement is voided. It seems improbable that the Allied Unions would support a strike since eight of them have reached agreement with Zuckerman. A work stoppage may occur, but with the technology which is available to the pro-

**934**

posed purchaser, if there is not general support by the Allied Unions, the newspaper could probably weather the work stoppage. Local 6 has threatened to attempt a boycott of the Daily News, too, but it is questionable at best whether a boycott would be of sufficient magnitude to sound the death knell for the Daily News. Any of these events is, of course, highly regrettable but I agree with the Debtor that the risk must be borne.

The possibility of large damage claims from the rejection certainly looms as a threat to the dividend which the unsecured creditors will receive. Yet the creditors' Committee supports the motion to reject. The Debtor urges that the claim will be a prepetition claim limited to one year's damages under 11 U.S.C. § 507. If that is so, then the additional $1,000,000 which Zuckerman will pay to the estate because the Debtor had to reject the contract will go a very substantial part of the way in ameliorating the harm to the estate. The union believes that its claim is not so limited and that if it were to successfully reverse a rejection on appeal it would be entitled to a staggering administrative claim. It also argues that if I grant rejection, because I have to find that modification was necessary to the estate, the union will be entitled to administrative priority under section 503. Obviously now is not the time to resolve these issues, but if the Debtor is correct, the damage claim will be of a reasonable size, albeit that it may dilute the return to unsecured creditors. Although the decision to reject is not easily made in light of the damage claim, given the bleak alternatives which continuation of the lifetime job guarantees would lead to, on balance the risk from rejection must be incurred.

In the end, as *Carey* notes, I have to focus on the Debtor's chances of reorganization absent the rejection. Because of the tremendous costs of assuming the lifetime job guarantees and because none of the prospective purchasers was willing to assume them, I am left with the conclusion that no one would fund the Daily News absent a rejection. I am also convinced that no one would agree to purchase it,

even for a drastically reduced price, before it has to cease operations. In short, without the relief sought, the Debtor is doomed and chapter 7 looms large. Although the loss of jobs will be painful, the equities tip decidedly in favor of the rejection.

## CONCLUSION

Allowing a debtor to reject a collective bargaining agreement can never be an easy decision. Yet Congress and the courts have clearly recognized that within the context of reorganization proceedings, this avenue for relief may be a debtor's only viable chance for successfully reorganizing. Still, in enacting section 1113 of the Bankruptcy Code, Congress has made clear its intent to have the court approve such motion only after finding that the debtor has surmounted the procedural and substantive hurdles mandated by the Code. The Debtor has met those burdens.

Its motion is granted. An order will be entered consistent with this opinion.