In re MAXWELL NEWSPAPERS, INC., d/b/a Daily News, Debtor.

**NEW YORK TYPOGRAPHICAL UNION NO. 6, Appellant,**

v.

**MAXWELL NEWSPAPERS, INC., d/b/a Daily News, Appellee.**

**Nos. 92 Civ. 8084 (LMM), 92–B15531 (TLB).**

United States District Court, S.D. New York.

Dec. 3, 1992.

Daniel Engelstein, Vladeck, Waldman, Elias & Engelhard, P.C., Andrew Irving, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for appellant New York Typographical Union No. 6.

Marc S. Kirschner, Jones, Day, Reavis & Pogue, New York City, for appellee-debtor Maxwell Newspapers, Inc.

Harvey R. Miller, Weil, Gotshal & Manges, New York City, for appellee New DN Co.

Howard Seife, Winston & Strawn, New York City, for statutory committee of unsecured creditors of Maxwell Newspapers, Inc.

Arthur Gonzales, Office of the U.S. Trustee, New York City.

## OPINION AND ORDER

(APPEALS FROM SECTION 1113 REJECTION, APPROVAL OF SECTION 363 SALE AND DISMISSAL OF ADVERSARY PROCEEDING TO COMPEL ARBITRATION)

McKENNA, District Judge.

### I.

Appellant New York Typographical Union No. 6 ("Printers") appeals from four orders of the Bankruptcy Court for the Southern District of New York (Brozman, B.J.): (i) that dated October 27, 1992, 146 B.R. 920, granting the motion of appellee Maxwell Newspapers, Inc. d/b/a Daily News ("Debtor"), publisher of the *Daily News*, to reject, pursuant to 11 U.S.C. § 1113, the Printers' collective bargaining agreement; (ii) that dated October 27, 1992 approving the sale, pursuant to 11 U.S.C. § 363, of certain of the Debtor's assets—in substance, the *Daily News* as an ongoing business—to New DN Co. ("DN"); (iii) that dated October 28, 1992 dismissing Debtor's adversary proceeding, by which it sought to compel arbitration of its claim that Debt-

or breached the collective bargaining agreement in agreeing to sell the *Daily News* to DN without requiring the latter to assume the lifetime job guarantee provision of the collective bargaining agreement; and (iv) that of October 28, 1992 denying the Printers' application for appointment of an examiner, pursuant to 11 U.S.C. § 1104, to determine whether DN impermissibly chilled the bargaining process. The appeals have been briefed, heard and decided on an expedited basis.

## II.

At the root of the dispute is the Printers' July 28, 1974 collective bargaining agreement as in effect immediately prior to the Bankruptcy Court's order approving rejection. The key provision of that agreement was summarized in *NLRB v. New York Typographical Union*, 632 F.2d 171, 174 n. 3 (2d Cir.1980):

> On July 28, 1974, Local 6 approved an 11–year contract with the New York Daily News and the New York Times which "virtually clear[ed] the road for automation of newspapers in New York City" and "[c]lose[d] a long era of resistance to technology that saw the demise of many of the City's daily newspapers...." "New York's ITU Settlement Clears Path for Automation," *Editor & Publisher*, Aug. 3, 1974 at 75. The contract followed 14 months of negotiations, and provided that employers would be permitted to introduce any technological advances in exchange for a guarantee of lifetime employment for current employees. The New York Times commented that "if the [new] contract marks a full turn towards rationality in bargaining, it also signals a slow slide into oblivion by the printers' union, now virtually doomed by its acceptance of the reality that automation is indispensable to newspaper survival." *New York Times*, July 29, 1974 at 12, col. 1.

There is no substantial dispute that, to the extent the Printers' jobs are now "obso-

lete," as asserted by Debtor, the obsolescence has resulted from the concession made in 1974 in exchange for the lifetime job guarantees.

The lifetime job guarantees now cover some 167 members of the Printers, of an average age of 58½ years. The Debtor's final proposal to the Printers provided for an immediate reduction of force to 80 jobs until the opening of a proposed new *Daily News* plant (which, the parties appear to agree, is expected to be completed in approximately two years), at which time the jobs would be reduced to 60; a year after that reduction the jobs would be reduced to 30, and another year later to 15, these 15 to be guaranteed for 13 years.[1] The Printers, although through previous proposals they had indicated a willingness to negotiate both the lifetime job guarantees and manning reductions if coupled with certain concessions, rejected Debtor's final proposal, which they characterize as recessive. The collective bargaining agreement also provides that any purchaser of the *Daily News* would be required to assume the lifetime job guarantees (as did Debtor upon its purchase of the paper).

## III.

11 U.S.C. § 1113 was enacted in 1984 in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Balancing national policies favoring both collective bargaining and the reorganization of financially troubled businesses, "[i]t created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion." *In re Century Brass Products, Inc.*, 795 F.2d 265, 272 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986). Section 1113 ensures that the debtor attempt to negotiate with the union prior to seeking to terminate a collective bargaining agreement. § 1113(b). In the event such ne-

---

**1.** The Debtor's proposals to the Printers, and the Printers' counterproposals, are described in the Bankruptcy Court's written decision of October 26, 1992, 146 B.R. 920 at 925–927, granting approval of rejection of the collective bargaining agreement.

gotiations fail, it delineates the standard by which an application by the debtor to terminate the collective bargaining agreement is to be judged by the bankruptcy court and establishes a time frame in which this determination is to be made. 11 U.S.C. § 1113(c), (d) (1988). *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir.1990), *cert. denied sub. nom., Air Line Pilots Ass'n, Int'l v. Shugrue,* — U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

> The language of the statute indicates that Congress intended § 1113 to be the sole method by which a debtor could terminate or modify a collective bargaining agreement and that application of other provisions of the Bankruptcy Code that allow a debtor to bypass the requirements of § 1113 are prohibited.

*Id.* at ——————, 112 S.Ct. at 989–990. "The debtor as the moving-party seeking rejection of its collective bargaining agreement has the burden of persuasion on the procedural requirements and substantive standards of § 1113." *Century Brass*, 795 F.2d at 276.

The Court of Appeals has set forth the scope of review of Bankruptcy Court determinations of applications to reject collective bargaining agreements pursuant to § 1113.

> The bankruptcy court's interpretation of the statute, specifically its reading of what the debtor must prove before the court may approve rejection, does constitute a conclusion of law subject to plenary review.... If the bankruptcy court correctly interprets the statute, however, its conclusions as to whether the debtor has or has not proven compliance with the statute will generally be factual findings which can be reversed only if clearly erroneous.

*Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir.1987) (citation omitted).

## IV.

The Printers challenge the rejection order on a number of grounds: they argue that 11 U.S.C. § 1113 does not apply in this case in which the transaction before the Bankruptcy Court involves, not the reorganization as a going concern of Debtor itself, but the sale of its assets to a purchaser; they argue in the alternative that, assuming the applicability of § 1113, Debtor has shown compliance with neither the procedural nor the substantive requirements of that section.

### 1.

■ The Bankruptcy Court found that 11 U.S.C. § 1113 applies to the transaction before it. 146 B.R. at 929–930. In this Court's view, the Bankruptcy Court came to the correct conclusion.

The Printers, on this issue, rely on the language of § 1113. That section, by its terms, refers to dealings between a debtor in possession or trustee and a union, not to dealings between a prospective purchaser of a debtor's ongoing business and a union. Further, as the Bankruptcy Court pointed out, "section 1113 makes no reference to a sale and, as a result, does not fit neatly into the sale context." *Id.* at 929. The section, moreover, does refer to "the reorganization of the debtor," albeit only once. 11 U.S.C. § 1113(b)(1)(A). The economic reality of the transaction at issue, on the other hand, is, in relevant respects, substantially the same as that of a reorganization of a debtor, in that what is to emerge from the transaction, if consummated, is the *Daily News*, reorganized as an ongoing business, albeit in the corporate form of DN, not of Debtor.

The legislative history of § 1113, *see generally Century Brass*, 795 F.2d at 272–273, and *In re Royal Composing Room, Inc.*, 848 F.2d 345, 352–354 (2d Cir.1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989) (Feinberg, C.J., dissenting), indicates clearly that that section represents an effort by Congress, in response to *Bildisco*, to prevent the termination of collective bargaining agreements as if they were ordinary executory contracts. It has as its purpose "to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion." *Century Brass*, 795 F.2d at 272. As Judge Feinberg pointed out in his dissent in *Royal Composing Room*, 848 F.2d at 352,

"Congress intended section 1113 to make rejection of signed labor contracts difficult (but not impossible) and was especially concerned that bankruptcy not become a union-busting tool." Against this background, it is hardly conceivable that Congress intended that § 1113 should apply exclusively to traditional reorganizations of a debtor itself and not to sales of a debtor's ongoing business, even though, in both cases, the surviving entity that will operate the surviving business—whether reorganized debtor or third-party purchaser—will have the same motive to be free of the existing collective bargaining agreement. The Printers have advanced no convincing distinction between the two types of transaction. While they argue that, in the present case, ordinary collective bargaining, unaffected by the conditions of § 1113, would be adequate to their purpose, it cannot be said that that argument would obtain in all cases of the sale of a debtor's ongoing business. The particulars of the present case, as posited by the Printers, should not control the construction of the statute.

The corollary of the application of § 1113 to sales of an ongoing business, of course, is that § 1113 applies to the same extent and with equal force to third-party purchasers as it does in the case of debtors in possession.

### 2.

■ 11 U.S.C. § 1113(c) provides that:

The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee [defined to include a debtor in possession] has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

With respect to the first and third of these required showings, this Court finds that the Bankruptcy Court came to correct conclusions on the basis of findings of fact which (with the exception of the finding required by subdivision (2), which may have been implicated in the Bankruptcy Court's conclusion with respect to subdivision (3)) are not clearly erroneous.[2]

Debtor, however, has not sustained its burden of showing that the Printers "refused to accept [Debtor's last] proposal without good cause." 11 U.S.C. § 1113(c)(2). In connection with this requirement, this Court finds that the Bankruptcy Court read the statute incorrectly and that its finding of fact—that the Printers refused to accept Debtor's last proposal without good cause—was clearly erroneous.

■ "Congress intended that a collective bargaining agreement remain in effect and that the collective bargaining process continue after the filing of a bankruptcy petition unless and until the debtor complies with the provisions of § 1113." *Ionosphere*, 922 F.2d at 990. In *Royal Composing Room*, the Court of Appeals considered the requirement of § 1113(c)(2):

In terms of § 1113, the burden on the parties to negotiate is best analyzed under § 1113(c)(2), which permits rejection of the agreement only if the union has rejected the debtor's proposal without good cause. If the union seeks to negotiate compromises that meet its needs while preserving the debtor's required savings, it would be unlikely that its rejection of the proposal could be found to be lacking good cause. If, on the other hand, the union refuses to compromise, it is as unlikely it could be found to have acted with good cause.

848 F.2d at 349. "This good cause requirement was ' "intended to ensure that a continuing process of good faith negotiations will take place before court involvement." ' " *Carey*, 816 F.2d at 92 (quoting

---

**2.** Counsel for Debtor indicated at oral argument that the Debtor–DN closing is to take place on December 7, 1992 but agreed that no closing would take place prior to midnight on December 3, 1992. In view of the need for expedition as well as what follows, the Printers' arguments with respect to subdivisions (1) and (3) are not further discussed.

*In re Royal Composing Room, Inc.,* 62 B.R. 403, 406 (Bankr.S.D.N.Y.1986) (quoting remarks of Rep. Morrison)). Thus, while subdivision (c)(1) is concerned with the nature of the proposal a debtor must make, subdivision (c)(2) focuses on the ensuing bargaining process.

Here, the Bankruptcy Court's construction of 11 U.S.C. § 1113(c)(2)—

> It would seem that a union may safely refuse the debtor's proposal if its members are being unfairly burdened relative to the other parties or the proposal is not necessary for the debtor's reorganization, but, otherwise, the union cannot safely turn down the proposal if it has not proferred an alternative which accomplishes the same economic end and fulfills the needs of the reorganization.

146 B.R. at 932—does not accurately reflect the intent of § 1113(c)(2), as construed in *Ionosphere, Royal Composing Room* and *Carey.*

■ The Bankruptcy Court's reading of § 1113(c)(2) would lead to rejection of a collective bargaining agreement in all cases except two—where the union members are "unfairly burdened relative to the other parties" and where "the proposal is not necessary for the debtor's reorganization." *Id.* at 932. Those two characteristics of a proposal that, in the Bankruptcy Court's formulation, may be rejected with good cause, are derived from § 1113(b)(1)(A), which requires the making of a proposal "which provides for those necessary modifications ... that are necessary to permit the reorganization of the debtor and assures that ... all of the affected parties are treated fairly and equitably." It is indeed Debtor's burden to show that those requirements of subsection (b)(1)(A) are

met prior to approval of rejection, but that burden is imposed by subsection (c)(1) (requiring a finding that Debtor has "made a proposal that fulfills the requirements of subsection (b)(1)"), not by subsection (c)(2), which, if it is to be given meaning, must be construed to impose a different and additional burden. The difficulty with the Bankruptcy Court's reading—allowing satisfaction of subsection (c)(2) through satisfaction of subdivision (c)(1)—is that it "suggests that the good cause provision adds nothing to the other substantive requirements of the statute." *Carey,* 816 F.2d at 92 (citation omitted). Such a reading of the statute was, however, at least implicitly, disapproved in *Carey,* as the sentence following that just quoted shows in its use of the word "nonetheless." *Id. Carey,* in its analysis of subdivision (c)(2), remains focused on the bargaining process, rather than merely on the content of a debtor's proposal, and the Court of Appeals arrived at the conclusion that the union did not have good cause to reject the proposal because of the union's refusal to negotiate, not because of the nature of the debtor's proposal. *Id.*[3]

This is not a case where a union "has assigned no reason for its refusal to accept a debtor's proposal." *Id.* (quoting *In re Royal Composing Room, Inc.,* 62 B.R. at 407). Such a reason, or, rather, two reasons—both the content and the timing of Debtor's final proposal—have been articulated, and Debtor thus "retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modifications." *Id.*

In the present case, the Printers, under a correct reading of § 1113(c)(2), a reading focusing on the bargaining process, had

---

**3.** *Carey,* and *Royal Composing Room,* dealt with situations in which, unlike the present case, the union would not bargain. In *Carey,* the union had not "participated meaningfully in post-petition negotiations," but "engaged in ... prehearing stonewalling." 816 F.2d at 92. In *Royal Composing Room,* "the union refused even to discuss the issue. Not only did the union take the position that priority was nonnegotiable; it went still further and refused to negotiate *at all* until priority was taken out of Royal's proposal." 848 F.2d at 349 (citation omitted). Here,

to the contrary, the Printers, although they "bargained hard," 146 B.R. at 932, did bargain, to the extent, moreover, that they made it clear that the key provision of the collective bargaining agreement—the lifetime job guarantee—was on the table. "On October 14, 1992, [the Printers] made a proposal to the Debtor which, although the Debtor deemed it unacceptable, the Debtor admitted was a constructive approach. There were several key elements to this proposal, the first of which was a retreat from lifetime jobs guarantees." *Id.* at 926.

good cause to refuse to accept Debtor's final proposal, that of "late in the evening on October 21," 146 B.R. at 927.[4]

The Printers' response to Debtor's final proposal can only be judged against the background of the parties' prior proposals. Following upon Debtor's October 1 proposal (146 B.R. at 925), which, in context, would eliminate all job security (a proposal that the Bankruptcy Court characterized as "a troubling one for the union," *id.* at 929), the Printers, on October 14, made a proposal that Debtor "admitted was a constructive approach." *Id.* at 926. The October 14 proposal by the Printers abandoned lifetime job guarantees for all members of the union, and provided for a progressive reduction of the number of shifts to be provided to the Printers from 835 to 540 initially, to 425 in 1996, to 300 in 1999, and to 200 in 2002.[5] The Printers' proposal included the requirement of an offer "to every bargaining unit member [of] a buyout of cash and three years' contribution to the pension and welfare funds as well as an early retirement enhancement." *Id.* at 926.

On October 15, Debtor responded with an offer which "hastened the reduction in shifts," did not "provide any buyout or payment to the pension and welfare funds," but provided "an early retirement subsidy payment which would take the form of adding 5 years to the age at retirement and 5 years to the working time at the Daily News." *Id.* at 926. The shift reduction proposed by Debtor would have had the effect of reducing shifts (assuming the construction of the new plant in two years) to 150 (or 30 jobs) by 1997. *Id.*

On October 19, the Printers' proposal "stood firm on the first shift reduction being to 540 but accelerated the dates and times of all later reductions down to 200 shifts [40 jobs]" and "tentatively agreed to the early retirement proposed by the Debtor and Zuckerman [the principal, apparently, of DN]." *Id.* The Printers did not address other changes, pending gap-closing on issues including guaranteed shifts and buyouts, and Debtor and Zuckerman made no counter-proposal, but continued discussions. *Id.*

Then, on October 21, the Printers revised their October 19 proposal, dropping the buyout, increasing from five to six years the early retirement enhancements, including a $10,000 payment to retiring employees and lowering Debtor's proposed immediate shift reduction from 400 to 500 and that to follow (in approximately two years) upon completion of the new plant from 300 to 350. *Id.* at 926–927. The Printers proposed, but then dropped, a proposal that would give remaining employees not less than four shifts per week.

Next, "late in the evening on October 21, [Zuckerman] delivered a final proposal." *Id.* That proposal is described at page 336 of this opinion, *supra.* This proposal was made on the evening before the scheduled hearing to consider both Debtor's motion to reject the collective bargaining agreement and to consider whether Debtor's asset sale to DN should be approved. As the Bankruptcy Court stated, "the union was caught off guard by the final proposal." *Id.* at 932. It was plainly reasonable for the Bankruptcy Court to have found that the Printers were taken off guard in view of the combination of the timing of the final proposal and the withdrawal of any inducement, of any kind, to early retirement. *Id.* at 932. Had Debtor's final proposal been made several days earlier, or had it reflected a further adjustment of the elements that had been under discussion since October 14—abandonment of lifetime job guarantees for all members of the Printers with a reduction in required shifts over a period of some years coupled with some consideration for the loss of job guarantees in the form of inducements for early retirement—the Printers might have been ex-

---

4. It is the final proposal by Debtor, not that of October 1, that is at issue. § 1113 contemplates a bargaining process, not a yes or no to the debtor's initial proposal. *See Carey,* 816 F.2d at 89.

5. The parties appear to have bargained in terms of shifts, rather than jobs. Five shifts per week is the equivalent of one full time job. Thus 167 full time jobs are represented by 835 shifts. 200 shifts are the equivalent of 40 full time jobs. *See id.* at 926.

pected to have responded with a counterproposal. The shift in direction of Debtor's proposal, however, in particular its abandonment of its own proposal of October 15 of the addition of years to age at retirement and years of service at the *Daily News*, quite obviously put the Printers in a position where, in order to make a meaningful counterproposal, more time was needed than the few hours remaining before the October 22 hearing. At issue for the Printers was not a relatively simple matter such as a wage rate, but the ability of members trained in the composing room and in or approaching their sixties to survive.

It is no answer to the foregoing to say that the cost to DN of a proposal of the "5 + 5" type was not quantifiable. That proposal was, after all, Zuckerman's, not the Printers', and its last minute withdrawal, in a final proposal, precluding any meaningful opportunity for consideration and counterproposal and further compromise, frustrated the bargaining process that Congress intended.

Nor is it any answer to insist on the obsolescence of the Printers' function and the unacceptability of the lifetime job guarantee provision. That is not really an issue at all. The Printers, in their first proposal on October 14, made it clear that the lifetime job guarantee for all of its members was negotiable, and have not insisted on it since.

Finally, the facts cannot support the proposition that the Printers are attempting to exercise a "veto power," *id.* at 933, over the proposed transaction. If anyone is doing so, it is the Debtor and DN. "[N]ow that the parties have proved unable to come to an accord, Drasner [Zuckerman's chief negotiator] says that he and Zuckerman will walk away from the transaction if [the Printers' collective bargaining agreement] is not rejected." *Id.* at 927. Such a position is not compatible with the good faith bargaining process Congress determined to be necessary in situations such as that now before the Court. While there can be no question about Congress' desire to enable troubled businesses to survive, there can also be no question about Congress' desire to preserve, as far as possible, collective bargaining agreements. Congress has determined that the accommodation of these interests is to be found in the process of good faith bargaining. Congress "made the point clear that the road to resolution of the conflict between labor and bankruptcy principles lies in honest compromise." *Century Brass*, 795 F.2d at 276.

Congress also recognized that there would be cases where the bargaining process would not accomplish its goal, and that rejection of a collective bargaining agreement would have to be considered. It did not say, however, that at that point a debtor (or a third-party purchaser) was to have its way. In enacting § 1113(c)(2) it recognized that in some cases a union might have good cause, in the end, to reject a debtor's (or third-party purchaser's) proposal. The burden of showing that such a proposal was rejected without good cause is on the debtor (or third-party purchaser) and, here, it has not been sustained. DN, of course, may be free to withdraw from the proposed transaction (just as it is free to continue to negotiate). But even the threat of closing the *Daily News* does not justify abandonment of the Congressional design.

### V.

The other orders appealed from were well within the Bankruptcy Court's "broad administrative power," *In re Chateaugay Corporation*, 973 F.2d 141, 144 (2d Cir. 1992) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983)), and all were supported by findings of fact (other than that to the effect that the Printers rejected the collective bargaining agreement without good cause) that are not clearly erroneous.[6]

### VI.

The orders appealed from are affirmed with the exception of that of October 27, 1992, granting Debtor's motion for approv-

6. *See supra* note 2.

al of rejection of the Printers' collective bargaining agreement, which is reversed for the reasons set forth above. The case is remanded to the Bankruptcy Court for proceedings not inconsistent with this Opinion.

SO ORDERED.