**In re HOFFMAN BROS. PACKING CO., INC., Debtor.**

**UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 770, et al., Appellants,**

v.

**OFFICIAL UNSECURED CREDITORS COMMITTEE and Hoffman Bros. Packing Co., Inc., et al., Appellees.**

BAP Nos. CC–93–1966–VJH, CC–93–2044–VJH.

Bankruptcy No. LA93–23593 BR.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 19, 1994.

Decided Sept. 16, 1994.

The appellate court's decision in *Eynetich* was not published.

Henry M. Willis, Los Angeles, CA, for United Food & Commercial Workers.

John P. Kreis, Los Angeles, CA, for Hoffman Bros. Packing Co., Inc.

Before VOLINN, JONES and HAGAN, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

The debtor in possession failed to make postpetition contributions to its employees' health plans and pension funds in breach of its obligation under collective bargaining agreements (CBAs) with its unions. It sought and was granted an interim order pursuant to 11 U.S.C. § 1113(e) providing prospective downscaling of benefits in four CBAs and sanctioning, *nunc pro tunc,* certain post-petition breaches. Subsequently, the court authorized the debtor to reject the CBAs. On appeal by one of the unions affected, we AFFIRM the interim order, but REVERSE and VACATE its retroactive effect; we AFFIRM the order authorizing rejection.

## SUMMARY OF FACTS AND PROCEEDINGS BELOW

Hoffman Brothers Packing Co., Inc. (Hoffy), the debtor in possession, is a meat processing plant. Prior to bankruptcy, Hoffy had CBAs with four unions representing its employees.[1] Appellant United Food and Commercial Workers Union, Local 770 (Lo-

---

1. The unions are: United Food and Commercial Workers, Local 770; International Union of Operating Engineers, Local 501; Wholesale and Retail Food Distribution, Teamsters Local No. 63; and Teamsters Automotive Workers' Union, Local 495. Appellant Local 770 represents a majority of Hoffy's employees.

cal 770) is the only union to pursue these appeals.[2]

The most recent CBA between Hoffy and Local 770 commenced on February 1, 1992 and remained effective until March 31, 1993. The CBA contained provisions relative to termination including an "evergreen clause" which would renew it automatically from year to year unless one party or the other took action to terminate it.[3]

On January 29, 1993, Local 770 sent a written notice to Hoffy which stated:

> In accordance with the provisions of the Agreement between your Company and UFCW Local 770, February 1, 1992–March 31, 1993, Local 770 officially notifies you of the Union's *desire to enter into negotiations to alter and/or amend said Agreement.* (Emphasis supplied.)

In subsequent bankruptcy litigation, this notice and its failure to use express termination language would become the focus of controversy as to whether the notice effectively terminated the CBA.

Hoffy filed a Chapter 11 bankruptcy petition on April 19, 1993. Hoffy's stated intention for filing was to prevent its forced liquidation and to effect a "going concern" sale of the business. Over the course of the next month, Hoffy managed to shore up its customer base and inventory supply. It reduced management wages and benefits, effected management layoffs, and arranged new financing with its lender. It also did not make payments on its unions' employee health and welfare benefits as agreed to in the CBA. These measures, while reducing the company's losses, did not succeed in eliminating the operating deficit and producing a profit sufficient to make Hoffy an attractive marketing prospect.

Hoffy had stopped making payments to each unions' health and pension funds prior to the bankruptcy filing date. Hoffy's failure to fund the health insurance threatened to cause Local 770's health insurance coverage to lapse on June 1, 1993. The coverage of Locals 501 and 63 lapsed one month earlier on May 1, 1993. On May 25, 1993, Hoffy met with the unions and asked them to approve its prior breaches, allow Hoffy to continue cuts in their pension benefits, and to change the unions' health insurance coverage. The unions did not agree.

Without having come to an agreement with the unions, Hoffy unilaterally switched its workers to a different health plan, Maxicare, on June 1, 1993. The cost savings to the company were significant; however, under the Maxicare plan, the benefits were less than the agreed options provided in the CBAs.

On June 11, 1993, Hoffy filed a motion in the bankruptcy court for interim modification of the collective bargaining agreement (the § 1113(e) motion) asking for *nunc pro tunc* modification of the agreements allowing the change in health coverage and suspension of the pension payments. Hoffy contended that *the modification was necessary to forestall* liquidation. Local 770 contended that its January 29 notice had effected termination of the agreement, and therefore there was no contract for the court to modify. Local 770 adopted this position because it asserted that upon termination of the collective bargaining agreement, Hoffy remained statutorily bound under the Labor–Management Relations Act (LMRA) 29 U.S.C. §§ 151 et seq., to bargain in good faith with the union prior to altering its obligations under the agreement, and that this issue was within the jurisdiction of the NLRB, not the bankruptcy court. Hoffy responded that Local 770's notice to amend did not effectively terminate the contract.

A hearing was held on June 28, 1993, and the court agreed with Hoffy. Finding that an emergency existed, the court granted

---

2. Local 770 is joined by appellants Butcher and Provision Workers Pension Fund of Southern California and Southern California Provision Industry Health and Welfare Fund.

3. Paragraph XXIX of the CBA provided:
 This agreement shall take effect on February 1, 1992, and shall continue in full force and effect until March 31, 1993, and from year to year thereafter *unless terminated by either Party by written notice of termination* sent by registered mail to the other not less than sixty (60) days prior to March 31, 1993, or prior to March 31st of any year thereafter. (Emphasis supplied.)

Hoffy *nunc pro tunc* relief, although the court modified the order to provide health coverage for the union uncovered during May. Local 770 sought and was granted leave to appeal the order to the BAP.

During the course of the above proceedings, Hoffy and the unions met regarding other modifications to the agreements. Hoffy presented an initial list of 12 modifications. Subsequently, six more were added. (The proposals are discussed in more detail *infra*.) Significant proposals included reduction of senior wages and an end to the seniority system. On its part, Local 770 demanded that Hoffy agree to bind its successors to any new agreement. The parties did not come to terms, and Hoffy brought a motion for authorization to reject the collective bargaining agreements (the § 1113(c) motion).

On July 29, Local 770 filed charges against Hoffy with the NLRB for unfair labor practices.[4] On August 30, 1993, the bankruptcy court heard argument on the motion to reject the CBAs. The court found that Hoffy had complied with the requirements of § 1113(c) by proposing necessary modifications and providing relevant information to the union, that the union had refused to accept the proposed modifications, that the unions' refusal was without good cause, and that the balance of equities favored rejection. The court authorized Hoffy to reject the CBAs. The order was entered October 1, 1993, and Local 770 timely appealed. The BAP granted Local 770's subsequent motion to consolidate the two appeals.

### ISSUES PRESENTED

1. Whether the bankruptcy court was without jurisdiction under § 1113 to modify Local 770's CBA or authorize Hoffy to reject it because the January 29 notice of the union's desire to alter and/or amend the CBA terminated it as of March 31, 1993.

2. Whether § 1113(e) allows a bankruptcy court to order or approve *nunc pro tunc* unilateral post-petition breaches of a CBA by a debtor in possession.

3. Whether the court committed reversible error when it authorized rejection of the CBAs.

### STANDARD OF REVIEW

■ In reviewing issues under § 1113, conclusions of law and questions of statutory interpretation are reviewed *de novo;* findings of fact are subject to the clearly erroneous standard. *In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2nd Cir.1992).

### DISCUSSION

#### I. General Considerations

In *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Supreme Court faced the question whether a debtor company in a Chapter 11 bankruptcy could unilaterally reject a collective bargaining agreement, and whether doing so without first bargaining with the union constituted an unfair labor practice under the LMRA. The Supreme Court, while acknowledging unanimously that a CBA differed from other executory contracts, nevertheless held that a debtor could reject a CBA for business reasons under § 365. The court majority stated that a bankruptcy court should "balance the equities" before authorizing rejection, but concluded that the debtor's unilateral rejection of the CBA did not constitute an unfair labor practice under the LMRA, and that unilateral rejection of the CBA was effective as of the date of the bankruptcy. Labor, perceiving that bankruptcy could become a means for discarding CBAs without incurring liability under the LMRA, reacted intensely. Legislation by the Congress overturning *Bildisco* was pro-

---

4. 29 U.S.C. § 158. **Unfair labor practices (LMRA § 8(a))**
 **(a) Unfair labor practices by employer.**
 It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; [§ 157 grants employees the right to bargain collectively.]

....
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title. [§ 159(a) establishes the employee's elected representative as the exclusive representative for collective bargaining.]

posed and opposed. As it happened, Congress, at the time, was urgently engaged in an effort to fill the bankruptcy void created by *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held the existing system unconstitutional. The urgency was created by the impending expiration of the stop-gap interim rules which kept the bankruptcy system temporarily afloat. In the course of legislative give and take relative to dealing with labor's problem and the need to reconstitute the bankruptcy system, § 1113, specifically treating collective bargaining agreements, became part of Chapter 11 of the new Code. It was not a tidy process. Passage of § 1113 was not accompanied by a committee report, and there is no dependable legislative history. For more detailed discussion of the background of § 1113, *see In re Royal Composing Room, Inc.,* 848 F.2d 345, 352–54 (2nd Cir.1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074, 1081–84 (3rd Cir.1986).

The drafting of the statute has been criticized. *See e.g., In re Mile Hi Metal Systems Inc.,* 899 F.2d 887, 898 (10th Cir.1990) (Seymour, C.J., concurring); *In re Alabama Symphony Ass'n,* 155 B.R. 556, 571 n. 32 (Bankr.N.D.Ala.1993). *See also* Daniel Keating, *The Continuing Puzzle of Collective Bargaining Agreements in Bankruptcy,* 35 William & Mary L.R. 503 (1994); Steven Kropp, *Collective Bargaining in Bankruptcy: Toward an Analytical Framework for Section 1113,* 66 Temple L.R. 697 (1993); Mitchell Rait, *Rejection of Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code: The Second Circuit Enters the Arena,* 63 Am.Bankr.L.J. 355 (1989); Douglas Bordewieck and Vern Countryman, *The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors,* 57 Am.Bankr.L.J. 293 (1983).

It is clear that § 1113 was intended to overturn *Bildisco's* 5–4 decision allowing unilateral rejection of a CBA by a Chapter 11 debtor, and to resolve the debate over the standard to be adopted for authorizing rejec-

tion by the court. Prior to *Bildisco,* two standards had been proposed. *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2nd Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975) held the standard for rejection to be that failure to do so would clearly result in collapse of the debtor. A more permissive standard was followed in *In re Brada Miller Freight System, Inc.,* 702 F.2d 890 (11th Cir.1983), where the test was held to be the equitable sharing of the burden of rejection. This was the standard applied in *Bildisco,* and specifically stated in § 1113(c) which also requires the debtor to engage in a good faith bargaining process as detailed in § 1113(b).

Under the LMRA, 29 U.S.C. § 158(d), the "obligation to bargain collectively," mandates the obligation to confer in good faith, "but such obligation does not compel either party to agree to a proposal or require the making of a concession[.]" 29 U.S.C. § 158(d) subsections (1), (2), and (4) mandate that a unilateral modification cannot be made while a CBA remains effective until the party wishing to modify it: (1) gives a 60 day notice, (2) offers to meet and confer, and (4) continues to perform its current obligations during the 60 day period.

The LMRA prescription for bargaining in good faith appears to have been considered by Congress as a basis for the bargaining process under § 1113 in order to bring about a negotiated solution as an alternative to rejection by the debtor under § 365 on the sole basis of the conventional business judgment standard. Thus the gateway to rejection of a CBA is controlled by § 1113(c) which articulates a procedure requiring the debtor to engage in a meaningful bargaining process with the representative of the employees as a condition to requesting approval of rejection. The mechanics of this process are prescribed in § 1113(b).

Because Chapter 11 debtors not infrequently are in dire financial straits and in need of immediate aid, § 1113(e) allows the court to order interim modification of an agreement prior to and pending completion of the debtor negotiating with the union as directed in § 1113(b) and (c). This subsec-

tion allows a debtor to obtain temporary emergency dispensation from complying with the CBA pending its acceptance or rejection, "if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate. . . ." The subsection requires review and authorization by the court, and does not dispense with the requirement to bargain prior to ultimate rejection of the agreement pursuant to § 1113(c). As indicated, changes under § 1113(e) are "interim" and as provided in § 1113(f), "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section," an all-inclusive reference to the whole of § 1113 as well as title 11 of the Bankruptcy Code.

 It is apparent that § 1113 authorizes a bankruptcy court to authorize rejection of a CBA provided that a good faith bargaining effort takes place. Likewise, the bankruptcy court may authorize, depending on economic necessity, interim departures from the terms of the CBA. These actions by a bankruptcy court necessarily cause a limited displacement of the jurisdiction of the NLRB, and, to this extent, the orders of the bankruptcy court will preclude issues resolved in its orders from being brought before or acted upon by the NLRB. The issues of retroactivity of the interim order and the propriety of the rejection order will be the primary subjects of discussion herein. We do not consider that issues within the jurisdiction of the NLRB relating to alleged pre-bankruptcy breaches of the CBAs, or post-petition breaches prior to bankruptcy court approval under § 1113(e) relative to interim relief (for the reasons indicated *infra*) are before us.

## II. Pre–Bankruptcy Termination of the CBA by Notice

 Local 770 has staked a considerable part of its case on the bankruptcy court's alleged lack of jurisdiction to deal with its CBA by virtue of its January 29 notice to

Hoffy. Because the CBA was terminated prior to bankruptcy, the argument goes, there is no contract under § 1113 for the court to modify or for Hoffy to accept or reject under § 365. The union then insists that despite termination of the contract, Hoffy is required by the LMRA to bargain to impasse before it can make any unilateral changes.

Local 770's position is based on the LMRA's requirement that when a CBA has expired, the parties must adhere to the status quo ante while "bargaining to impasse." [5] *Laborers Health and Welfare Trust Fund for Northern Cal. v. Advanced Lightweight Concrete Co., Inc.,* 484 U.S. 539, 544 n. 6, 108 S.Ct. 830, 833 n. 6, 98 L.Ed.2d 936 (1988) (quoting *NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962)). "Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a non-coercive atmosphere that is conducive to serious negotiations on a new contract." *Katz* at 742–43, 82 S.Ct. at 1111. Assuming then that the union's contention of termination is correct, in a non-bankruptcy setting, the debtor would have the right to modify the terms after the contract expired only after it has bargained to impasse.

 The relevant CBA provision, paragraph XXIX, addresses only a "written notice of termination." The union's letter to Hoffy speaks only to "negotiations to alter and/or amend." The union attempts to reconcile these divergent terms by contending that because the contract does not provide for amendment or alteration, and since significant displacement or replacement of the original contract terms is implicit in the notion of such change, the only conclusion that can follow is that the letter was directed to termination. However, the terms amendment or alteration differ literally and conceptually from termination. Amendment or alteration, whether major or minor, connote survival and continuation to a greater or lesser degree of the original subject matter. Termination, once it occurs, means that its

---

5. In *Laborers Health and Welfare Trust,* the Supreme Court defined "impasse" as a "state of facts in which the parties, despite the best of faith, are simply deadlocked." 484 U.S. 539, 544 n. 5, 108 S.Ct. 830, 833 n. 6 (internal quotations and cite omitted.)

subject matter no longer exists. There is nothing left to negotiate, let alone alter or amend. Presumably the union knew how to use the word "terminate," particularly since the term was used in the notice provision of the CBA. It chose not to.[6]

The union should be bound not only by the language it chose to use but also by what it chose to omit. In this context the case of *KCW Furniture, Inc. v. NLRB*, 634 F.2d 436 (9th Cir.1980) is relevant: the contract in question referred to ending its term by termination or negotiation. In a notification as to dealing further with the contract, the latter term "negotiation" was used. The court held that selection of the process of negotiation did not give notice of termination.

■ We consider appellant's argument an empty semantic exercise not only for the foregoing reason, but also because the terms of a CBA status *quo ante* continue in effect until an impasse has been reached because the LMRA so mandates. Until such impasse, the agreement continues "in effect," as recognized by § 1113(e),[7] and it is implicit in § 1113(c), since the basic purpose of § 1113 is meant to grant ultimate jurisdiction to the bankruptcy court to accept, modify, or otherwise alter or terminate the status *quo ante* rights and obligations between a debtor employer and its employees, whether they are established under a currently existing CBA or pursuant to the LMRA. It is also clear that prior to modification or rejection, the conditions of § 1113 must be followed.

As indicated, the contract before us also continued on by virtue of the LMRA, which provides that the mandatory terms in a CBA will continue on after termination while the parties bargain to impasse. If the union's notice had in fact effectively terminated the CBA, this situation existed on the date of

bankruptcy. There is no conflict between the LMRA provision for subsistence of a contract after its expiration and § 1113 of the Bankruptcy Code which provides for bargaining under the auspices of the bankruptcy court.

It is plain that at bottom the union is of the view that the NLRB should be the sole arbiter of labor relations matters. However, "The plain meaning of a statute is ordinarily dispositive unless that meaning is contrary to the legislature's intent or would lead to absurd results." *U.S. v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1067 (9th Cir.1994). The drafters of § 1113 clearly meant to grant jurisdiction to the bankruptcy court to modify or otherwise alter the status *quo ante* rights and obligations between a debtor employer and its employees whether they exist under a currently existing CBA or are carried over by agreement or pursuant to the LMRA. To eliminate bankruptcy court jurisdiction or provide for parallel or overlapping jurisdiction by two tribunals would lead to confusion, conflict and costly delay.

### III. Interim Modification Under § 1113(e)

■ On June 11, 1993, some seven weeks after bankruptcy, Hoffy filed a motion in the bankruptcy court pursuant to 11 U.S.C. § 1113(e) requesting emergency interim modification of the CBAs, and asking the court to authorize, *nunc pro tunc* as of the April 19 filing date, its unilateral breach of the health and welfare benefit provisions of the CBA.[8] Hoffy contended that the modifications were necessary to forestall immediate liquidation.

The court heard argument on the motion on June 28, 1993 and agreed with Hoffy. Finding that an actual emergency existed, the court granted Hoffy *nunc pro tunc* relief,

---

6. While the representative of the debtor in the case before us stated in writing to the union that the contract was terminated, in the absence of the debtor having acted in some manner responsive to termination, the letter is not conclusive. It is the bankruptcy judge's analysis that is decisive.

7. "If during a period when the collective bargaining agreement continues *in effect....*" 11 U.S.C. § 1113(e) (emphasis added).

8. The aggregate health and pension benefits cost the debtor an average of $98,000 per month for the 12 months prior to the hearing. The proposed health care change would save the debtor $67,000 per month, a reduction of more than two thirds. The coverage under the two plans and relative costs are compared in the record. The debtor's postpetition arrearages under the CBAs were $114,116 ($83,028 for health and welfare; $31,088 for pension benefits).

modifying the terms of the CBA to abrogate Hoffy's pension obligations as of the date of filing of the petition, April 19, 1993. In order to provide continuity of health coverage for members of Locals 501 and 63 who were not covered during May, the court allowed retroactive relief for Hoffy's health insurance obligation only back to June 1, 1993. The order was entered July 30, 1993, and Local 770 sought and was granted leave to appeal the order to the BAP.

The parties do not dispute that Hoffy's interim modifications to the CBA were "essential to the continuation of the debtor's business...." 11 U.S.C. § 1113(e). As no other basis for modification is necessary, we can affirm the court's order of modification.

Local 770's primary objection to the § 1113(e) order is the order's retroactive effect. Pursuant to § 1113(f), "*No* provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement *prior* to compliance with the provisions of this section" (emphasis supplied).

Hoffy's failure to perform its pension and health insurance obligations without the unions' consent and prior to court approval was a unilateral act, and as such, strictly prohibited by § 1113(f). It is contended, however, that the bankruptcy court's authority to effect *nunc pro tunc* relief derives generally from its equitable power under § 105, and that this grant of equitable jurisdiction is not precluded by the language of § 1113(f).[9]

■■■ Under a plain meaning analysis, we start with the language of the statute itself. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Section 1113(e) authorizes "interim" relief, with an implication of temporary or transient change. Section 1113(f) provides that no provision "of this title" shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a

CBA "prior to compliance with the provisions of this section." This mandate necessarily includes the provision of § 1113(e) that permissible modifications may be authorized by the court only "after notice and a hearing." Retroactive modification would by-pass and nullify the foregoing requirements which are fundamental to the purpose of § 1113.

Section 1113(e) is a provision which allows, in the case of emergency, a temporary departure from the regular course of the Code as prescribed by § 1113(b) and (c). Any interim remedy provided by § 1113(e) is subject to the requirement of an application for rejection as set out in subsections (b) and (c) and an order thereon. Thus whatever changes may result can only be "interim."

Aside from plain language considerations, policy considerations relating to § 1113 should not permit a debtor, unilaterally and without prior authority of the court, to seek condonation of its unauthorized post-petition breach. It would invite Chapter 11 debtors (who have not already done so) to unilaterally breach their CBAs, allow a considerable period of time to go by (the period of time in this case was not insignificant), and then seek absolution from a breach by requesting retroactive relief by the trial court. In this particular case, a considerable period of time need not have elapsed. The debtor knew on the day it filed its petition that it was already delinquent in the payment of health and welfare benefits and that its delinquency promised to continue. There is no reason why it could not have filed immediately a motion for relief under § 1113(e). Instead it delayed and then requested relief which would not only be prospective, but by virtue of the request for *nunc pro tunc* relief, would retroactively legitimize its unilateral breach of a contract to which the debtor in possession was committed. The debtor in possession as trustee of the estate wanted to maintain going-concern value. This goal could not be accomplished without employees, whose ex-

---

9. Hoffy cites as authority for its position a case that mentioned but denied possible *nunc pro tunc* relief. *In re United Press International, Inc.*, 134 B.R. 507 (Bankr.S.D.N.Y.1991). The debtor asked the *UPI* court to grant *nunc pro tunc* approval of past unilateral wage reductions under § 1113(e). Labor had agreed to make wage

concessions. The court denied retroactive modification of the wages "because of a failure of proof," and without any discussion of the issue. *Id.* at 515. This case is questionable authority at best; the court was not required to face the issue directly.

186

pectations under the CBA cannot be impaired without first employing the procedure prescribed by § 1113, which provides for prospective, not retroactive relief. To give § 1113(e) relief permanent effect by allowing it to reach back can only thwart the letter and spirit of § 1113.

■ The broad grant of power in § 105 does not provide an escape hatch. Section 105 must in all cases be carefully construed so as to implement and fit the specific provisions of the Bankruptcy Code. It should not be used for ventures beyond direct or immediate implementation of orders or judgments entered pursuant to provisions of the Bankruptcy Code.

> It is true that bankruptcy courts sit as courts of equity. However, a fundamental principle of equity jurisprudence is that "equity follows the law." Courts of equity are bound to follow express statutory commands to the same extent as are courts of law.... Bankruptcy courts are no more entitled to ignore the law than are other courts of equity.

*In re Shoreline Concrete Co., Inc.*, 831 F.2d 903, 905 (9th Cir.1987) (internal citations omitted).

The transcript of the hearing indicates that the court intended to defer requiring the debtor to immediately cure its breach rather than to destroy the unions' right to an administrative claim therefor.[10] The court in its oral statement reserved determination of the nature of any claims. However, by its terms the order does not provide for such a reservation and could be read to extinguish these claims. Thus the retroactive aspect of the interim order must be reversed so that the unions may be permitted to file administrative claims for their members' postpetition unpaid benefits accruing prior to entry of the court-ordered modification.

*IV. Rejection Under § 1113(c)*

■ A preliminary question arises as to whether or not a debtor who proposes to sell the business free and clear of a collective bargaining agreement can be said to be bargaining in good faith. To put it otherwise, can a debtor file a Chapter 11 liquidation plan which contemplates sale of all its assets to another party who, effectively, will not be bound by any collective bargaining agreement which may be arrived at with the debtor in possession?

It is probable that Hoffy will command a higher sale price if it is sold as a going concern rather than auctioned off piecemeal and that a going-concern Hoffy is more salable without the perceived economic disadvantages of the CBAs. It is arguable that such a procedure, being tantamount to liquidation of the business, may be incompatible with § 1113. It is not as if the debtor has no other alternative. The debtor could file under Chapter 7, and a trustee could operate the business pending sale. But here the debtor chose Chapter 11 and selected a course which by emphasizing economic necessity and the need to disengage without qualification from the CBA in order to get a better sale, seems at odds with § 1113. Under these circumstances, there is some credibility to appellant's contention that the debtor could not and did not deal with the union in good faith. This problem was considered in one of a trilogy of cases in the Second Circuit.[11] *In re Maxwell Newspapers, Inc.*, 149 B.R. 334 (S.D.N.Y.1992), the court faced a similar circumstance where the debtor proposed the sale of a newspaper as a going concern. The court found the distinction between reorganization of a debtor and the sale of a going concern asset to a third party to be irrelevant to considerations under § 1113, based on Chapter 11's goal of continuing the enterprise, regardless of the ownership. We agree, and hold that § 1113 does not preclude rejection of CBAs where the purpose

---

**10.** *See In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701 (9th Cir.1986), which held that union employees were entitled to CBA benefits as an administrative expense for post-petition work.

**11.** *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2nd Cir.1992), *reversing in part In re Maxwell Newspapers, Inc.*, 149 B.R. 334 (S.D.N.Y.1992), *reversing in part In re Maxwell Newspapers, Inc.*, 146 B.R. 920 (Bankr.S.D.N.Y.1992) (authorizing rejection of CBA).

or plan of the debtor is to liquidate by a going concern sale of the business.[12]

■ In order to reject a collective bargaining agreement under § 1113(c), a debtor must demonstrate that:

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

Subsection (b)(1) mandates that a debtor shall:

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide ... the representative of the employees with such relevant information as is necessary to evaluate the proposal.

The debtor must demonstrate that it has made a proposal for "necessary" modifications that are "necessary" for reorganization, 11 U.S.C. § 1113(b)(1)(A), and which assures that all creditors are treated "fairly and equitably." *Id.* The court may authorize rejection only if the union refuses to accept the debtor's proposal "without good cause." 11 U.S.C. § 1113(c)(2).

During the course of these proceedings, Hoffy presented to the union an initial list of 12 modifications. By letter dated June 24, 1993, Hoffy outlined its proposals and stated they were "absolutely essential." Significant proposals included reduction of senior wages and an end to the seniority system for layoffs and overtime. Hoffy's letter then stated:

The modifications outlined below are interdependent; the amendment or exclusion of any one or more of these modifications would force Hoffman to reconsider the whole package and would likely result in the introduction of certain additional modifications which it has not so far proposed.

Local 770 refused to accept Hoffy's 12 proposals. On August 9, Hoffy added six additional proposals. Local 770 responded to Hoffy's 18 proposals by letter on August 12, rejecting 11 of them and stating its reasons for rejecting them. Local 770 also took the position that Hoffy would have to agree to bind its successor to any new CBA and to assume liability in the event the successor refused to be bound. The original CBA did not contain such a clause.[13] The parties did not come to terms, and Hoffy brought a motion for authorization to reject the CBAs pursuant to § 1113(c).

In all, Hoffy offered 18 proposed modifications, some of which clearly meet the § 1113(b) standard of "necessary" modifications "necessary" to the reorganization, i.e. wage rollbacks, elimination of pension funding, and less expensive health insurance. These are straightforward dollar issues. Other proposed modifications are problematic, such as elimination of dues checkoff and seniority, and requiring the union to ratify

12. *Maxwell* is distinguishable from this case in that the union was engaged in § 1113 negotiations with the prospective purchaser, where here, there was no such purchaser in sight. However, the debtor itself was negotiating an agreement which would subsist pending a transfer; it also advised the union by letter dated June 24, 1993 that it would notify the union as to the identity of a bone fide prospective purchaser.

13. The CBA merely required Hoffy to notify prospective owners of the CBA:
Article XXVII—Change in Ownership
*Section 1.* In the event of a change of the ownership of the plant occurring for any reason, the Employer shall, nevertheless, remain liable for all monetary benefits that employees have accumulated under this Agreement up to the effective date of such change. The Employer agrees in the event of a proposed sale, lease or transfer, whether of the entire plant or a portion thereof, to notify the Union of such proposed sale, lease or transfer, prior to the finalizing of any such transaction. The Employer agrees in the event of a sale, lease or transfer, whether of the entire plant or a portion thereof, to notify the successor, leasee [sic], purchaser or transferee, of the existence of this Agreement.

the debtor's unilateral changes, in essence stipulating to dismissal of its NLRB complaint. These modifications for the most part, while arguably non-economic, were found by the court to be related to the economic benefit of the debtor. This finding is not clearly erroneous.

On the other hand, Local 770 could not tell the court that it made any concessions to Hoffy on its unobjectionable proposals. The union refused to agree to many of the proposed modifications and demanded incorporation of successor liability into any agreement. The parties agree that without such a clause, any new buyer, while not bound by Hoffy's contract with the union, would nevertheless be required to bargain with it pursuant to the LMRA. This, coupled with the fact that the debtor offered in its letter of June 24, 1993 to furnish the name of the purchaser once meaningful negotiations produced one, places the parties more or less in the same position as with the original CBA provision, Article XXVII, relative to change of ownership. Thus, the union's insistence on this added provision created a gratuitous impediment to the debtor's prospects for reorganization.

 Hoffy also proposed that the union ratify Hoffy's unilateral failure to pay the health and pension funds. Local 770 asserts that this proposal is per se illegal. In the case of *In re Mile Hi Metal Systems, Inc.*, 67 B.R. 114 (D.Colo.1986), the district court vacated and remanded approval of rejection ruling that the court clearly erred by failing to consider the legality of some of the debtor's proposals. The Tenth Circuit vacated, *In re Mile Hi Systems, Inc.*, 899 F.2d 887 (10th Cir.1990), holding that rejection was not *per se* invalid even if some of the proposals were illegal.

## CONCLUSION

### I. *Rejection of the CBA.*

Local 770 contends that the court's findings are clearly erroneous because of the refusal of the debtor to bargain in good faith

as evidenced by the debtor's insistence on non-economic provisions discussed above. Even though we may view many of these proposals and the manner in which they were made as stringent, therefore giving the union good cause to negotiate, the union failed to establish that it made constructive counter-proposals.

The court entered extensive findings of fact.[14] The court in a brief oral closing statement considered rejection appropriate because the union and the debtor had come to impasse stating:

> ... this is really not an easy decision but I think for the survival of the debtor as well as these employees, and I can understand, that is why my job is easier in a sense, because clearly either the union or the debtor don't want to give away anything and I clearly understand the negotiating postures and that's why, I guess, my job in a sense is easier because I have to look at the entire picture. So I do think that this is—that rejection is appropriate.

> Clearly the parties are going to have to work—in particular the management's going to have to deal with the union fairly at this point even though they will be—the union employees will not be getting what they had before, but if there is a problem there will be no business because the union will just walk out. So, in any case, I just want you to understand that I understand the significance of this and these are very difficult things and rejection of it is not an easy matter for me to do but I will do it ...

The court entered findings setting forth the sequence of the negotiations between the debtor and the union, as well as summaries of the proposals made or exchanged at the various negotiating sessions in detail, and concluded that the balance of the equities favored rejection. Considering the court's findings and conclusions in the light of the record, we cannot conclude that the court's findings are clearly erroneous or that its conclusions are improper.

---

14. We recognize that the findings, prepared by the debtor, are somewhat argumentative and present substantial detail not alluded to by the court in its oral opinion. Nevertheless, the court reviewed the findings and adopted them which is sufficient.

All things considered, particularly the failing condition of the debtor, and the benefit to all concerned if Hoffy could survive, the court had enough facts before it to justify the conclusion that the equities of the case warranted rejection of the CBA. The court's order authorizing rejection of the CBA therefore is affirmed.

### II. The Order of Modification Under § 1113(e).

Section 1113 grants the bankruptcy court jurisdiction to authorize alteration of the relationship of the parties to a CBA. However, § 1113 must be interpreted to require the debtor to bargain with the union and either gain its consent or the consent of the court before it initiates any unilateral changes in its relationship during bankruptcy. *Nunc pro tunc* interim modification pending rejection is impermissible in the light of the cautionary language of § 1113(e) and (f). We AFFIRM the prospective aspect of the interim order of modification but REVERSE its *nunc pro tunc* effect. We hold that the order is effective prospectively between the date of its entry on July 30, 1993 and the date of the order rejecting the CBA entered on October 1, 1993. Only those breaches subsequent to court approval are immune from the LMRA and may be deemed general unsecured claims. We REMAND for the entry of an order assigning priority administrative status to claims arising in the period between the date of bankruptcy, April 19, 1993 and the date of the § 1113(e) order, July 30, 1993, based on the CBA provisions.