In re THINKING MACHINES
CORPORATION, Debtor.

THINKING MACHINES
CORPORATION,
Appellee,

v.

MELLON FINANCIAL SERVICES
CORPORATION # 1,
Appellant.

No. 95–1575.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1995.

Decided Oct. 17, 1995.

Kevin J. Simard, with whom Charles R. Bennett, Jr. and Riemer & Braunstein, Boston, MA, were on brief, for appellant.

Charles R. Dougherty, with whom Jonathan C. Lipson and Hill & Barlow, Boston, MA, were on brief, for appellee.

Before SELYA and STAHL, Circuit Judges, and GORTON,* District Judge.

SELYA, Circuit Judge.

This appeal compels us to address a nagging question of bankruptcy law on which no court of appeals has yet spoken and on which lower federal courts are divided. The problem relates to the operation of section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a) (1994), a statute that permits a Chapter 11 trustee, subject to certain conditions, to assume or reject any unexpired lease or executory contract in existence on the date the insolvency proceeding commences. Because the trustee's actions require court approval, and because the Code treats nonresidential leases differently than other leases or executory contracts, requiring the estate to continue paying rent at the contract rate until rejection takes effect, 11 U.S.C. § 365(d)(3), a question arises: Is court approval a condition precedent or subsequent to the effective rejection of a nonresidential lease pursuant to section 365(a)? This question is of considerably more than academic interest. Time is money in the waiting game that Chapter 11 often entails, and substantial sums can ride on how quickly the trustee can jettison a

* Of the District of Massachusetts, sitting by designation.

high-priced lease. In this case, for example, the determination of which date controls carries with it a swing of approximately $200,-000.

The courts below disagreed on how the question should be answered. The bankruptcy court ruled that the debtor's rejection of its lease took effect only on court approval. *See In re Thinking Machines Corp.,* 178 B.R. 31 (Bankr.D.Mass.1994). The district court reversed, holding that the rejection was effective on the date that the debtor gave appropriate notice of its decision to reject.[1] *See In re Thinking Machines Corp.,* 182 B.R. 365 (D.Mass.1995). Concluding, as we do, that the statute is most propitiously read to make court approval a condition precedent to an effective rejection of a nonresidential lease, we now reverse.

## I. BACKGROUND

The material facts are undisputed. In 1990, Thinking Machines Corporation ("TMC" or "the debtor") leased a building in Cambridge, Massachusetts, from Mellon Financial Services Corporation # 1 ("Mellon"). Apparently, the environs were not sufficiently conducive to fertile thought, for, on August 17, 1994, TMC filed a voluntary petition seeking relief under Chapter 11 of the Code, 11 U.S.C. §§ 1101–1145. TMC proceeded to operate the business as a debtor in possession. It continued to occupy the demised premises, using only a fraction of the space. On September 13, 1994, TMC filed a motion asking the bankruptcy court to approve its decision to reject the lease. The court granted the motion on October 4.

Three weeks later, Mellon moved for immediate possession of the premises and payment of $345,915.89 (representing administrative rent accrued at the contract rate through the date on which the bankruptcy court had approved the debtor's rejection of the lease, plus associated expenses). TMC parried this thrust by touting the motion filing date as the effective date of its rejection (and, therefore, the outer boundary of its liability under the lease). It also tendered to Mellon $143,326.45 (the amount due under the lease through the motion filing date).

The bankruptcy judge resolved the dispute in Mellon's favor, ruling that the rejection did not take effect until the court had approved it, and that, accordingly, the debtor owed Mellon $210,150.26 (the difference between the total amount due under the lease through October 4 and the partial payment previously made by the debtor) plus interest and common area maintenance charges.[2] *See Thinking Machines,* 178 B.R. at 34. When TMC appealed, the district court took a different slant. It held that the rejection occurred on September 13, 1994 (the motion filing date), and that, therefore, no further payments were due. *See Thinking Machines,* 182 B.R. at 369. This appeal ensued.

## II. STANDARD OF REVIEW

We afford plenary review to determinations of law made by a district court sitting in appellate review of a bankruptcy court order, ceding no special deference to the district court. *See, e.g., In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 73 (1st Cir.1995); *In re G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991); *In re Navigation Technology Corp.* 880 F.2d 1491, 1493 (1st Cir. 1989). This standard is fully applicable here, as it is in all cases in which we are asked to decipher the meaning of a statute. *See, e.g., In re Jarvis,* 53 F.3d 416, 419 (1st Cir.1995); *United States v. Holmquist,* 36 F.3d 154, 158 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1797, 131 L.Ed.2d 724 (1995); *United States v. Gifford,* 17 F.3d 462, 472 (1st Cir.1994).

---

1. This date is sometimes called, in bankruptcy parlance, the "motion filing date." The label refers to the requirement that the trustee or debtor in possession must signify an election to accept or reject a particular lease by the filing of a motion to that effect in the bankruptcy court. *See* Fed.R.Bankr.P. 6006, 9014. Mindful of the pithy advice that St. Ambrose is reputed to have offered St. Augustine ("When you are at Rome live in the Roman style."), *see* Jeremy Taylor, *Ductor Dubitantium,* I, I, 5 (1660), we shall employ this terminology.

2. We note an $80 discrepancy between the bankruptcy court's judgment and the total claimed arrearage. This appears to be traceable to the court papers. We do not pursue the point, confident that any necessary adjustment can be made on remand.

## III. ANALYSIS

We organize our analysis in three segments, dealing with the statutory framework, the time when the rejection of a nonresidential lease becomes effective under that framework, and the implications of our exercise in statutory construction on the calculus of relief.

### A. *The Statutory Framework.*

Section 365(a) states, with exceptions not relevant here, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).[3] This proviso furnishes the trustee with a multipurpose elixir for use in nursing a business back to good health. On one hand, the trustee may prescribe the elixir as a tranquilizer to ease the fears of squeamish suppliers and customers so that they will continue doing business with a bankrupt corporation. On the other hand, the trustee may prescribe it as an emetic to purge the bankruptcy estate of obligations that promise to hinder a reorganization.

Having originally given Chapter 11 trustees broad latitude in dispensing the elixir, Congress subsequently diluted the potion. Since section 365(a), as initially enacted, contained no temporal boundaries within which a trustee had to assume or reject an unexpired lease, and did not require debtors to pay rent at the contract rate while the trustee equivocated, commercial landlords felt themselves unfairly disadvantaged because, unlike other creditors, they were forced to continue extending credit to the debtor during the pendency of the reorganization proceeding. *See* 130 Cong.Rec. 20084, 20088 (daily ed. June 29, 1984), *reprinted in* 1984 U.S.C.C.A.N. 590, 598–99 (statement of Sen. Hatch). Whether or not love of money is the root of all evil, it is at the least a powerful motivator. Spurred by financial self-interest, the landlords lobbied successfully for passage of the so-called Shopping Center Amendments (the "S/C Amendments") as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333.

The S/C Amendments alter the equation in two significant respects. First, they direct the trustee, in a timely fashion, to "perform all the obligations of the debtor ... under any unexpired lease of nonresidential real property, until such lease is assumed or rejected." 11 U.S.C. § 365(d)(3). This provision requires the trustee, *inter alia*, to pay rent under the lease at the contract rate unless and until he rejects it, and gives the landlord what amounts to a preference—in the form of an administrative claim—for such avails. Thus, section 365(d)(3) is a marked departure from the tenet, reflected throughout the Code, that post-petition administrative expenses should be allowed only for "actual, necessary costs and expenses of preserving the [bankruptcy] estate." 11 U.S.C. § 503(b)(1)(A). Second, if the trustee fails to take a position in regard to the lease within sixty days from the date of the order for relief under Chapter 11 (or within such longer period as the court, on application, may fix), the lease is deemed rejected at that juncture. *See* 11 U.S.C. § 365(d)(4). This provision gives the bankruptcy estate a measure of protection against indecision or inadvertence on the trustee's part.

These modifications ameliorate, but do not entirely solve, several of the problems related to tenant bankruptcies that historically have plagued commercial landlords. One surviving problem concerns the rampant uncertainty as to whether a rejection will be deemed effective on the date of the trustee's decision or only when the court thereafter endorses the decision. It is to this question that we now turn.

### B. *When Is A Rejection Effective?*

 The best hope for capturing congressional intent is by focusing on the language purposefully deployed by the legislature. Thus, a statute ordinarily will be con-

---

**3.** For ease in reference, we discuss the issue in terms of trustees. We recognize, however, that under Chapter 11 a debtor in possession has essentially the same rights, powers, and duties as a trustee, *see* 11 U.S.C. §§ 1107(a), 1108, including the right under § 365(a) to assume or reject a nonresidential lease. Thus, our comments and conclusions, context permitting, are equally applicable to debtors in possession.

strued according to its plain meaning. *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992); *In re Jarvis,* 53 F.3d at 419; *Pritzker v. Yari,* 42 F.3d 53, 67–68 (1st Cir. 1994), *cert. denied,* ⸺ U.S. ⸺, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995). But, when Congress' words admit of more than one reasonable interpretation, "plain meaning" becomes an impossible dream, and an inquiring court must look to the policies, principles and purposes underlying the statute in order to construe it. *See Pritzker,* 42 F.3d at 67; *see also Sullivan v. CIA,* 992 F.2d 1249, 1252 (1st Cir.1993) (explaining that courts may "look behind statutory language" when the legislature "blows an uncertain trumpet"). Congress, after all, does not legislate in a vacuum.

Here, the protagonists assure us that the statutory language is plain, and that we need not go beyond it. The debtor says that under section 365(a) the rejection of a nonresidential lease "plainly" becomes effective on the motion filing date (when notice of rejection is given), subject to defeasance in the event a judge later vetoes the trustee's decision. The landlord says that under section 365(a) the rejection of a nonresidential lease "plainly" cannot become effective until the court approval date (when the bankruptcy court places its imprimatur on the decision). The authorities are divided as to which interpretation of the statutory language is appropriate. Some courts (albeit a minority) believe that section 365(a) should be read, as TMC successfully argued in the district court, to align judicial approval as a condition subsequent to the trustee's independently effective rejection of a nonresidential lease. *See, e.g., In re Joseph C. Spiess Co.,* 145 B.R. 597, 604 (Bankr.N.D.Ill.1992); *In re 1 Potato 2, Inc.,* 58 B.R. 752, 755–56 (Bankr.D.Minn.1986). Other courts (more numerous, overall) believe, as Mellon successfully argued in the bankruptcy court, that section 365(a) should be read to require

judicial approval as a condition precedent to an effective rejection of a nonresidential lease. *See, e.g., In re Paul Harris Stores, Inc.,* 148 B.R. 307, 309 (S.D.Ind.1992); *In re Federated Dept. Stores, Inc.,* 131 B.R. 808, 815–816 (S.D.Ohio 1991); *In re Swiss Hot Dog Co.,* 72 B.R. 569, 571 (D.Colo.1987); *In re 1 Potato 2, Inc.,* 182 B.R. 540, 542 (Bankr. D.Minn.1995); *In re Revco Dept. Stores, Inc.,* 109 B.R. 264, 267 (Bankr.N.D.Ohio 1989). No court of appeals has ventured to answer the question.[4]

In our judgment, this collision of viewpoints underscores the obvious: although the text of section 365(a) plainly indicates that a trustee's rejection of a nonresidential lease is conditional upon court approval, the text is unclear as to whether that approval constitutes a condition precedent or subsequent to an effective rejection. Consequently, section 365(a) is ambiguous in this respect. *See United States v. Gibbens,* 25 F.3d 28, 34 (1st Cir.1994) ("A statute is ambiguous if it can be read in more than one way.").

■ While the competing interpretations proposed by the parties are both reasonable renditions of the statute's language, we believe that section 365(a) is most faithfully read as making court approval a condition precedent to the effectiveness of a trustee's rejection of a nonresidential lease. Therefore, the date of court approval, not the motion filing date, controls. We are guided to this conclusion by several signposts.

■ First and foremost, we think that the structure of the Bankruptcy Code and the nature of judicial oversight in the Chapter 11 milieu combine to make it highly likely that Congress intended judicial authorization to be a condition precedent to rejection. Bankruptcy is inherently a judicial process. From the moment that a debtor's petition is filed in the bankruptcy court, the debtor's property is in *custodia legis. See* 1 William C. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 3:2 (1994). From that point

---

4. Contrary to Mellon's characterization, *In re Arizona Appetito's Stores, Inc.,* 893 F.2d 216 (9th Cir.1989), is not on point. There, the Ninth Circuit merely observed that "rejection of an unexpired lease can be accomplished only by an order of the bankruptcy court." *Id.* at 219–20

(dictum). The statement is correct as far as it goes—but it does not go far enough. The issue here is not whether court approval is required under section 365(a)—clearly, it is—but whether a purported rejection becomes legally effective *before* court approval is secured.

forward, the bankruptcy court is charged with overseeing the trustee's management in order to ensure that the interests of the bankruptcy estate are served. *See* 4 Norton, *supra,* § 77:4.

Judicial oversight of the reorganization process takes two forms. Many routine decisions are made by the trustee without any specific clearance from the bankruptcy court, and are reviewed (if at all) only in the course of an examination of the trustee's overall stewardship (say, when a plan of reorganization is proposed or when an application for fees is filed). Other decisions are not effective unless they are specifically sanctioned by the court. In those instances, judicial approval is almost invariably a condition precedent to the trustee's action.[5] Arranging matters in this sequence facilitates judicial oversight, minimizes false starts, and enhances the efficiency of the process. We can think of no convincing reason why Congress would abruptly depart from this tried-and-true formula. More importantly, we are confident that if Congress wished to inaugurate so radical a change, it would have taken pains to mark the trail brightly.

A second reason for reading section 365(a) to require judicial approval as a condition precedent to rejection of a nonresidential lease is rooted in history. Congress enacted section 365(a) as part of the Bankruptcy Code of 1978, making court approval of such rejections obligatory for the first time. The predecessor to section 365(a), section 70(b) of the Bankruptcy Act of 1898, 11 U.S.C. § 110(b) (repealed 1978), and the applicable bankruptcy rule governing actions taken pursuant to section 70(b), Fed.R.Bankr.P. 607 (repealed 1978), did not explicitly require judicial approval of a trustee's rejection of a lease, and many courts held that the trustee, acting alone, could make a rejection stick. *See, e.g., Vilas & Sommer, Inc. v. Mahony (In re Steelship Corp.),* 576 F.2d 128, 132 (8th Cir.1978). The conclusion is irresistible

that Congress, by changing the protocol in 1978, intended to involve bankruptcy courts more actively in the decisional process. We believe that this policy of increased involvement is better served by viewing judicial approval as a condition precedent to the effectiveness of a rejection instead of as a condition subsequent.

In a related vein, we note that several courts have found support for requiring court approval as a condition precedent to rejection in two extant rules of bankruptcy procedure, namely, Fed.R.Bankr.P. 6006 and 9014. *See, e.g., Revco,* 109 B.R. at 268. Read together, these rules require a trustee who desires to reject a lease to file a formal motion to that effect. This, too, constitutes an innovation for, previously, the rules did not provide a formal procedure for rejecting leases. We think this is another sign that Congress intended courts to become more involved in the decisional process, and, thus, reinforces our vision of court approval as a condition precedent to a valid rejection of a nonresidential lease.

 The third reason for our view is that reading the statute in the manner favored by the district court tends to reduce a bankruptcy court's order of approval to a bagatelle. So interpreted, the provision would trivialize judicial oversight of the rejection process. Court orders are customarily important events in the life of a judicial proceeding; they are the primary means through which courts speak, *see, e.g., Advance Financial Corp. v. Isla Rica Sales, Inc.,* 747 F.2d 21, 26 (1st Cir.1984), and they should carry commensurate weight. We see no reason for allowing a trustee to substitute his voice for that of the court. The trustee may sing all he wants, but it is the court that must call the tune. *Cf.* W.A. Mozart, *Le Nozze di Figaro,* Act 1, sc. 2 (1786) (Figaro's Aria).

Along the same lines, we think that the district court's "valid, but voidable" construct, *see Thinking Machines,* 182 B.R. at

---

5. We note several examples. Before using, selling, or leasing property of the estate outside the ordinary course of business, the trustee must seek court approval. *See* 11 U.S.C. § 363(b)(1). Unless each entity that has an interest in cash collateral consents, the trustee may not use cash collateral unless the bankruptcy court first grants

authorization. *See* 11 U.S.C. § 363(b)(2)(A), (B). If the trustee seeks extraordinary post-petition financing, he must first obtain court approval. *See* 11 U.S.C. § 364(b). And the trustee may not abandon property of the estate, even if burdensome, without obtaining court approval. *See* 11 U.S.C. § 554(a).

368, is largely bereft of meaning. In the rejection scenario, the sole reason for seeking court approval is to cut off the debtor's post-petition liability, imposed by section 365(d)(3), under the unexpired nonresidential lease. If the bankruptcy court disapproves the trustee's motion for rejection, then the "rejection" never had any meaningful legal existence in the first place—the trustee will remain liable for rent at the contract rate from the inception of the insolvency proceeding. As judicial approval will always be the last step in the rejection pavane, it follows that the trustee's repudiation of a lease can never be valid in any meaningful sense until the court has acted.

A final reason for our view stems from a concern that treating a rejection as "valid, but voidable" from the motion filing date forward would further ensnarl the tangles inherent in the complexities of modern commerce. If "valid, but voidable" were the rule, the parties could act on the trustee's notice, and their actions would have to be undone if the court later disagreed. Traditionally, attempts to unwind bankruptcy transactions after the fact have proven nettlesome, *see, e.g., In re Stadium Mgmt. Corp.,* 895 F.2d 845, 849 (1st Cir.1990); *In re Texaco,* 92 B.R. 38, 50 (S.D.N.Y.1988), and we will not lightly assume that Congress intended to invite these myriad complications.

This round trip back to the future serves to highlight the importance of factual certainty in the rejection process. In adopting a requirement of court approval, Congress overruled precedent that allowed trustees to show by informal conduct that they had either assumed or rejected leases (or other executory contracts, for that matter). Thus, the requirement seems to have been designed at least in part to remedy the problems attendant upon informal or equivocal rejections—particularly the lack of clear notice to landlords as to when they could safely redeem and relet their property. *See* Gregory G. Hesse, *A Return to Confusion and Uncertainty as to the Effective Date of Rejection of Commercial Leases in Bankruptcy,* 9 Bankr.Dev.J. 521, 531 (1993) (discussing legislative history). Treating a trustee's rejection of a nonresidential lease as "valid, but voidable" tugs in the opposite direction, promoting uncertainty rather than dispelling it.[6]

■ In an effort to resist the force of these four reasons, TMC counters with two principal points. First, it notes that the language used in section 365(a) is atypical. Congress traditionally employs the vocabulary of prior authorization when inserting a requirement of court approval in the Code. For example, the statutes cited in note 5, *supra,* all say that "the court, after notice and a hearing," may authorize particular actions. TMC visualizes the somewhat different wording of section 365(a) as betokening a different mechanism. But it is risky to read too much into Congress' use of an alternative formulation, especially when the new language is opaque. We are unwilling, without more, to construe the mere absence of an explicit reference to securing court approval in advance as an intentional departure from the pattern of prior court approval woven throughout the fabric of the Bankruptcy Code.

Next, TMC complains that using the date of court approval as the termination date of a nonresidential lease burdens the scarce resources of bankruptcy estates. In this respect, section 365(a), in conjunction with section 365(d)(3), departs from one of the general themes of Chapter 11 in that it hinders the trustee's efforts to rid the bankruptcy estate of unnecessary baggage. But general themes are, by definition, general; they are not necessarily controlling in all specific instances. Since the S/C Amendments purposefully discounted this general theme in

---

6. We do not think that it is any real answer to insinuate that "valid, but voidable" is workable because a bankruptcy court will usually support a trustee's desire to scrap an unexpired nonresidential lease. The magnitude of the harm that a landlord might suffer if the bankruptcy court subsequently disapproved a particular rejection after the landlord diligently relet the rejected premises, or incurred substantial expenses to rehabilitate or advertise them, brings into focus the potential unfairness inherent in adopting the motion filing date as the effective date of a rejection. We have no reason to think that Congress intended to add an element of Russian roulette to the already tumultuous effects of the reorganization process on commercial landlords.

relation to the specific circumstances presented by nonresidential leases, TMC's policy argument is best directed to the legislative, not the judicial, branch.

■ We need go no further. For the reasons limned above, we hold that a rejection of a nonresidential lease under section 365(a) becomes legally effective only after judicial approval has been obtained.

### C. *Relief Under Section 365(a).*

■ Although we have decided the precise issue presented on appeal, we think it behooves us to make clear that nothing in our holding today precludes a bankruptcy court, in an appropriate section 365(a) case, from approving a trustee's rejection of a nonresidential lease retroactive to the motion filing date. We explain briefly.

■ Bankruptcy courts are courts of equity, *see Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), and, particularly in the Chapter 11 context, they may sometimes abandon mechanical solutions in favor of the pliant reins of fairness. *See, e.g., Winthrop Old Farm Nurseries,* 50 F.3d at 75 (explaining that a bankruptcy court, applying principles of equity, may in its discretion choose between valuation methods). In the section 365 context, this means that bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation. *See In re Jamesway Corp.,* 179 B.R. 33, 39 (S.D.N.Y. 1995) (holding that a bankruptcy court can order rejection retroactive to an earlier date "to avoid penalizing the debtor for an unnecessary delay caused by the creditor"); *see also In re Garfinckels, Inc.,* 118 B.R. 154, 154 (Bankr.D.D.C.1990) (suggesting that, in the absence of unfair prejudice, a bankruptcy court may enter an order nunc pro tunc setting the motion filing date as the effective date of approval); *see generally* 11 U.S.C. § 105(a) (authorizing bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Title 11).

■ Of course, the equitable powers of bankruptcy courts are not unlimited. They can only be brought to bear in the service of the Bankruptcy Code. *See Norwest Bank, Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988). Thus, a bankruptcy court's exercise of its residual equitable powers must be connected to, and advance the purposes of, specific provisions in the Code. *See, e.g., In re Hoffman Bros. Packing Co.,* 173 B.R. 177, 185–86 (9th Cir. BAP 1994) (invalidating nunc pro tunc order that contradicted an express Code provision). There is little question, however, that a retroactive order may be appropriate as long as it promotes the purposes of section 365(a).[7] Consequently, we rule that a bankruptcy court, when principles of equity so dictate, may approve a rejection of a nonresidential lease pursuant to section 365(a) retroactive to the motion filing date.[8]

The fact that the bankruptcy court has the power to approve the trustee's rejection of an unexpired nonresidential lease retroactive to the motion filing date has a salutary side effect; it should act as a stimulus to all parties to cooperate in getting the trustee's motion to reject heard and determined at the earliest practicable date. Moreover, the possibility of retroactivity helps to explain the seeming rift in the case law. Witness, for example, *In re Joseph C. Spiess Co.,* 145 B.R. 597 (Bankr.N.D.Ill.1992), the leading case cited by the district court in support of its "valid, but voidable" rationale. A close reading of *Spiess* indicates that the court may have reached its ultimate conclusion—that the rejection took effect on the motion filing

---

**7.** Retroactive approval orders do not contradict § 365(d)(3). While that provision commands the trustee to pay rent at the contract rate until a nonresidential lease is rejected, it does not stipulate that a rejection cannot be made to apply retroactively. *See Jamesway,* 179 B.R. at 37.

**8.** We note, in this connection, that because such retroactive orders are within the bankruptcy court's sound discretion, appeals from a bankruptcy court's disposition of a request for retroactive relief will be reviewed only for abuse of discretion. *See, e.g., Jarvis,* 53 F.3d at 420; *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 30 (1st Cir.1994); *In re Gonic Realty Trust,* 909 F.2d 624, 626 (1st Cir.1990).

date as opposed to the court approval date—on the basis of equitable, rather than statutory, principles. The court's actual holding is illuminating. After determining "that the trustee's rejection of a lease should be retroactive to the date that trustee takes affirmative steps to reject said lease such as serving notice on motion to reject," the court held that a court-approved rejection of an unexpired nonresidential lease could "apply retroactively to the date the trustee notices the motion requesting same." *Spiess,* 145 B.R. at 606. Thus, *Spiess* can fairly be read as an instance of a bankruptcy court recognizing that retroactive approval orders are within its equitable powers under section 365(a), and acting on that realization.

Reading *Spiess* in this manner bridges the apparent conflict in the case law. Doctrinal incoherence vanishes, and a single black-letter rule emerges: rejection under section 365(a) does not take effect until judicial approval is secured, but the approving court has the equitable power, in suitable cases, to order a rejection to operate retroactively.[9]

## IV. CONCLUSION

We reverse the decision of the district court, vacate its order, and direct that it remand the matter to the bankruptcy court (which, if it so elects, may in its discretion reconsider its original order in light of this opinion).

*The judgment of the district court is reversed, and the cause is remanded to the district court with instructions to remit the case to the bankruptcy court. Costs in favor of appellant.*

---

9. Because no two cases are exactly alike, we eschew any attempt to spell out the range of circumstances that might justify the use of a bankruptcy court's equitable powers in this fashion. That exercise is best handled on a case-by-case basis.